**DOGLOO, INC., a California Corporation**

v.

**DOSKOCIL MANUFACTURING CO., INC., a Texas Corporation.**

**No. CV–94–3572–ABC.**

United States District Court, C.D. California.

April 14, 1995.

Darrell L. Olson, Steven J. Nataupsky, Deborah S. Shepherd, Knobbe, Martens, Olson & Bear, Douglas W. Abendroth, Lawrence J. Hilton, David J. Van Havermaat, O'Melveny & Myers, Newport Beach, CA, for plaintiff.

Laurence H. Pretty, Mark Garscia, Pretty, Schroeder, Brueggemann & Clark, Los Angeles, CA, Robert M. Chiaviello, Jr., David G. Wille, Kelly M. Tullier, Richard J. Moura, Baker & Botts, L.L.P., Dallas, TX, for defendant.

COLLINS, District Judge.

This Order amends and supercedes the Court's prior Findings of Fact and Conclusions of Law and Preliminary Injunction Order. This matter having come before this Court upon Plaintiff's Motion for Preliminary Injunction, and the Court having considered Plaintiff's moving papers, reply papers, and surreply papers, and Defendant's opposition papers and surreply papers, including all supporting declarations and evidence submitted in connection with those papers, as well as the arguments of counsel for the parties at an oral hearing on March 6, 1995 and the physical exhibits presented at the hearing, and having considered Defendant's written objections hereto, this Court makes the following findings pursuant to Federal Rule of Civil Procedure 65(d).

## I. *FINDINGS OF FACT*

1. Plaintiff Dogloo, Inc. ("Dogloo") brought a Motion for Preliminary Injunction against alleged acts of trademark infringement and related counts seeking to enjoin the sale of certain animal shelters by Defendant Doskocil Manufacturing Company, Inc. ("Doskocil").

2. This Court has subject matter jurisdiction under 15 U.S.C. § 1121, 28 U.S.C. § 1331, 28 U.S.C. § 1338(a) and (b), 28 U.S.C. § 1367(a), and 28 U.S.C. § 1332(a).

3. Dogloo is a California corporation having its principal place of business in Corona, California.

4. Doskocil is a Texas corporation having its principal place of business in Arlington, Texas.

5. Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c).

6. Dogloo began marketing an igloo or dome-shaped dog house, the "Dogloo igloo," in 1987. The Dogloo igloo is made of structural foam, which is a strong, light, insulating material often used in aerospace technology. Order p. 2, l. 9–12.

7. Dogloo owns U.S. Trademark Registration No. 1,631,630, registered January 15, 1991, for a configuration of a pet shelter. Order p. 2, l. 12–13.

8. Dogloo owns U.S. Letters Patent No. 4,962,729 ("the '729 patent"), for the manufacture of a structural foam dog house. Order p. 2, l. 13–15.

9. The Dogloo igloo pet shelter constitutes about 38% of all company revenues and is Dogloo's core product. Paxman Decl. at ¶¶ 8–9. Order p. 29, l. 7–8.

10. Dogloo has presented extensive evidence of its continuous use of the igloo shape as well as advertising efforts showcasing the igloo shape. Dogloo's advertising is not limited to local campaigns. Rather, Dogloo has produced evidence that it has engaged in a nationwide ad campaign, spending over $3 million over the past five years in its promotion of the igloo shape. Paxman Decl. ¶ 10. Dogloo advertises in four national publications, *Better Homes & Gardens, Family Circle, Dog Fancy,* and *AKC Gazette. Id.* at ¶ 12. Many of Dogloo's advertisements make prominent use of the igloo configuration through drawings or actual pictures of the Dogloo igloo pet shelter. Order p. 23, l. 18–20; p. 24, l. 1–11.

11. Dogloo has also received national television exposure on such shows as Entertainment Tonight and CBS This Morning. Paxman Decl. ¶ 15. Due to Dogloo's extensive promotional efforts, a large number of potential buyers have been exposed to the Dogloo igloo configuration. Order p. 24, l. 11–15.

12. Dogloo's customers include large mass merchandisers, warehouse clubs, hardware stores, home improvement centers and pet retailers. Order p. 2, l. 15–17.

13. Doskocil is a leading manufacturer in the pet products industry. Due to its size and capability, Doskocil is Dogloo's main competitor in the plastic dog house business. Order p. 2, l. 27–28; Paxman Decl. ¶ 28; Order p. 29, l. 9–11.

14. Doskocil has over $64 million in sales while Dogloo's yearly sales are about $38 million. Thus, Doskocil's revenue is significantly larger than Dogloo's. Order p. 29, l. 26–28; p. 30, l. 1–2.

15. Unlike Dogloo, dog houses are not Doskocil's main product line. On the con-

trary, Doskocil specializes in producing airplane pet kennels and sells a wide array of pet products in addition to dog houses. Order p. 30, l. 11–14.

16. In June 1994, Doskocil introduced a dog house under the names "PET DOME" or "DOME HOME" (hereinafter collectively "DOME HOME"). Order p. 3, l. 4–6.

17. The DOME HOME pet shelter, like the Dogloo igloo pet shelter, utilizes a dome-shaped configuration. Order p. 3, l. 6–7.

18. Doskocil claims its consumer research indicates that consumers prefer the functional features offered by a dome-shaped dog house. Doskocil also claims that it intended to design a dome-shaped dog house that looked different from and improved on the disadvantages of the Dogloo igloo pet shelter. Order p. 3, l. 7–12. According to Doskocil, the labeling of the DOME HOME pet shelter distinguishes it from the Dogloo igloo pet shelter.

19. Dogloo has submitted substantial evidence with regard to alternative designs which embody the same functional advantages as its igloo shape. Mechanical engineer Scott Meek testified that within the category of domed shelters, a large number of alternative designs are available. He indicated that the igloo shape was not the exclusive medium for creating a "dome." Meek drew 12 configurations which he claims have the same functional advantages as the igloo configuration. Exhs. 235–252, attached to Meek Decl. These configurations use a number of different combinations of curved, slanted, or straight edges or surfaces to create a domed shelter that does not mimic the igloo shape. None of these alternative shelters resembles the igloo shape. Order p. 17, l. 16–28; p. 18, l. 2–3.

20. Meek testified that the alternative dome configurations could "provide substantially equivalent functionality in terms of habitable space, energy efficiency, wind stability, and cost of manufacture." Meek Decl. ¶ 14. For example, Meek testified that one of his proposed configurations would actually be superior to the igloo shape because of its reduced volume, reduced surface area, reduced lower wind profile, and reduced material requirements. *Id.* at ¶ 17. According to Meek, these differences would improve the energy efficiency and wind stability of the structure while lowering production costs by reducing the amount of material needed to produce the shelter. *Id.* at ¶ 16. Order p. 18, l. 11–21.

21. Although Meek's testimony is contradicted by the testimony of Doskocil's employee, Melaney Northrop, the Court is persuaded that Dogloo has produced sufficient evidence to demonstrate that there are alternative configurations which are functional equivalents of the igloo shape. Order p. 18, l. 22–26.

22. Doskocil has presented evidence that numerous advertisements for the Dogloo igloo pet shelter refer to the "shape" of the shelter and tout various functional advantages. Some of the strongest examples of such advertising claims credit the igloo shape with energy efficiency which keeps the pet warm in the winter; superior thermal insulating; extra room for pets to circle and sleep; wind resistance; easy shipping, moving and stacking; and deflecting the sun's rays to keep pets cooler in the summer. Exhs. 574, 575, 578, and 619. Other advertisements indicate that the cave-like doorway of the Dogloo igloo pet shelter attracts the dog inside and shields against the wind and rain. Exhs. 579, 580, and 619; Order p. 19, l. 7–18.

23. The Court acknowledges that Dogloo's advertising refers to advantages offered by the igloo shape. Such advertising is probative of functionality. However, it appears that many of the functional qualities referred to in the advertisements are either (1) a function of a characteristic of the Dogloo igloo pet shelter other than its shape such as the structural foam material or (2) capable of being attained without the use of an igloo shape. For example, it appears the Dogloo igloo pet shelter's energy efficiency, which keeps the pet warmer in the winter, is more a function of the insulating qualities of the structural foam material than the igloo shape. Order p. 19, l. 19–28; p. 20, l. 1.

24. Dogloo has produced evidence of actual confusion between the Dogloo igloo and the DOME HOME pet shelters. A consum-

er who thought he was ordering a Dogloo igloo testified that he mistakenly attempted to order a DOME HOME pet shelter. Levesh Decl., Exh. 28. Levesh testified that when he saw the Doskocil DOME HOME in a store, he thought it was merely a variation of the Dogloo igloo. Levesh Decl., Exh. 28 ¶¶ 1–2. Levesh also testified that the salesman gave him a DOME HOME flyer on which the salesman wrote Dogloo's model number and size dimensions. *Id.* at ¶¶ 2, 5. Consequently, Levesh called Doskocil and attempted to order a pet shelter meeting the model number and size dimensions of the Dogloo igloo. Order p. 25, l. 1–12.

25. In addition, Dogloo has presented evidence of consumer confusion through the submission of survey evidence (the "Mantis Survey"). In the Mantis Survey, interviewees were shown a Doskocil DOME HOME pet shelter. They were asked a series of questions to ascertain their beliefs regarding the source or sponsorship of the DOME HOME pet shelter. Mantis Decl. ¶ 8. The survey indicated that 22% of the interviewees were confused. Table V of Mantis Decl., Exh. 22. The Mantis Survey concluded that the DOME HOME pet shelter is likely to cause confusion by leading consumers to believe that it is produced or authorized by Dogloo. Order p. 25, l. 13–22.

26. Doskocil's survey expert, Phyllis Welter, testified the survey was flawed because, among other things, Dogloo's survey expert George Mantis failed to use a control group, improperly categorized responses and did not include all of Doskocil's labeling in the survey. Welter Decl. Dogloo has attempted to discredit Welter's criticisms by pointing to inconsistencies in her own writings and her deposition testimony. On a preliminary injunction motion, the Court need not reconcile a battle of the experts over the accuracy of the Mantis study. Rather, the Court need only determine if Dogloo has a fair chance of proving that its survey evidence is accurate and probative. Dogloo has provided enough evidence for purposes of this motion to support the validity of its survey. Order p. 26, fn. 13.

27. Doskocil claims that the DOME HOME pet shelter uses a shingle design rather than the ice block design used by Dogloo. In addition, Doskocil points out that the two pet shelters have a different split between the base and top portions. Notwithstanding these design variations, after looking at physical samples of the DOME HOME and the Dogloo igloo pet shelters, as well as photographs thereof, the Court recognizes that the two pet shelters are visually similar. Order p. 26, l. 12–18.

28. There is evidence that the DOME HOME and Dogloo igloo pet shelters are marketed in close proximity and that the two products utilize similar marketing channels, as both products are sold through pet stores, warehouse clubs, hardware and home improvement stores. Paxman Decl. ¶ 17 and 22; Order p. 27, fn. 14.

29. Moreover, the Court has also examined the photographs depicting the proximity of these products at points of purchase in retail stores. In some instances, it appears the DOME HOME and Dogloo igloo pet shelters are placed side-by-side in stores. Order p. 27, l. 6–9.

30. Dogloo has presented evidence that it has lost sales to Doskocil because distributors are now splitting their orders between the two dog house companies. Order p. 29, l. 11–13.

31. In the early 1990's, Dogloo brought a patent infringement suit against Contico, Inc. ("Contico"), a pet products business, claiming that Contico was infringing the '729 patent for a structural foam dog house. In settlement of that action, Dogloo entered into a Patent License and Release Agreement (hereinafter "License/Release Agreement") with Contico. Order p. 2, l. 18–23.

32. In 1992, Doskocil purchased Contico's entire pet products business. In that transaction, Contico assigned Doskocil its rights under the License/Release Agreement. Order p. 3, l. 1–4.

33. Doskocil claims it has acquired all right, title and interest in and to any "trademark" rights in a pet shelter under the name "Z Daug Haus." The assignor of the Z Daug Haus is Zamzow's Inc. ("Zamzows") which operates a chain of retail stores in Idaho. Order p. 27, fn. 15.

34. Doskocil has produced evidence that thousands of Z Daug Haus pet shelters have been sold and that the marketing area included Idaho as well as surrounding states such as Washington, Oregon and Colorado. Order p. 28, fn. 15, 1.14–16.

35. It appears that the Z Daug Haus pet shelter was sold and marketed in a much more limited area than the Dogloo igloo pet shelter. However, the Court declines to rule on the evidentiary dispute regarding the scope of sales for the Z Daug Haus pet shelters at this time. Order p. 28 n. 15.

36. To the extent any Conclusions of Law are deemed to be Findings of Facts, they are hereby incorporated into these Findings of Fact.

## II. *CONCLUSIONS OF LAW*

### A. *Standard for Preliminary Injunction*

■ 1. Under the so-called "traditional test," a Court may issue a preliminary injunction if it determines: 1) the moving party will suffer irreparable injury if the relief is denied; 2) the moving party will probably prevail on the merits; 3) the balance of potential harm favors the moving party; and, depending on the nature of the case, 4) the public interest favors granting relief. *International Jensen v. Metrosound U.S.A.,* 4 F.3d 819 (9th Cir.1993). Order p. 4, 1. 1–9.

■ 2. The Ninth Circuit has also adopted an "alternative standard" under which the moving party may meet its burden by demonstrating either: 1) a combination of probable success on the merits and the possibility of irreparable injury if relief is not granted; or 2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *Id.* at 822. "The alternative standards 'are not separate tests but the outer reaches of a single continuum.'" *Id. citing Cassim v. Bowen,* 824 F.2d 791 (9th Cir.1987). Order p. 4, 1. 9–18.

■ 3. Essentially, the trial Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Schwarzer & Tashima, *Federal Civil Procedure Before Trial,* at 13:39. Order p. 4, 1. 18–22.

### B. *Probability of Success on the Merits*

■ 4. To obtain a preliminary injunction, a plaintiff need not show it will positively prevail on the merits. Rather, a plaintiff need only demonstrate a "reasonable chance of success on the merits" for preliminary injunctive relief. *Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 421 (9th Cir.1991); *Wilson v. Watt,* 703 F.2d 395 (9th Cir.1983). A reasonable probability requires only a showing of a "fair chance of success on the merits" or the raising of "questions serious enough to require litigation." *Benda v. Grand Lodge of IAM,* 584 F.2d 308, 315–16 (9th Cir.1978). If the balance of other factors tips decidedly toward the moving party, a preliminary injunction may issue if he or she "has raised questions so serious and difficult as to call for more deliberate investigation." *Dataphase Sys., Inc. v. C.L. Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981); *County of Alameda v. Weinberger,* 520 F.2d 344 (9th Cir.1975). Order p. 6, 1. 7–14.

### 1. *Trade Dress Infringement*

■ 5. Under section 45 of the Lanham Act, a "trademark" is "... any word, name, symbol or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." 15 U.S.C. § 1127. In contrast to a trademark, "trade dress" refers to the " 'total image of a product' and may include features such as size, shape, color combinations, texture or graphics." *International Jensen,* 4 F.3d at 821–22. Order p. 6, 1. 15–23; p. 7, 1. 1.

■ 6. To prevail on a trademark or trade dress infringement claim, whether under Section 32 or 43(a) of the Lanham Act or the common law, a plaintiff must demonstrate that the trademark or trade dress 1) is inherently distinctive or has acquired secondary meaning; 2) is nonfunctional; and 3) is likely to be confused with the alleged infringing product by members of the consuming public. *See Two Pesos, Inc. v. Taco Cabana,*

*Inc.,* —— U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Vuitton et Fils S.A. v. J. Young Enter., Inc.,* 644 F.2d 769 (9th Cir. 1981). Order p. 21, l. 5–10; p. 22, l. 1–2.

### a. *Secondary Meaning*

7. To have trademark protection a mark may either be inherently distinctive or it can acquire distinctiveness through secondary meaning. "The prime element of secondary meaning is a *mental association* in the buyers' minds between the alleged mark and a single source of the product." 1 McCarthy § 15.01 at 15–8. "A product configuration has secondary meaning if the purchasing public associates that configuration with a particular source." *Clamp Mfg. Co. v. Enco Mfg. Co.,* 870 F.2d 512, 517 (9th Cir.), *cert. denied,* 493 U.S. 872, 110 S.Ct. 202, 107 L.Ed.2d 155 (1989); *See also Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 820 (9th Cir.1980) (secondary meaning is "mental recognition" that products marked with the same symbol "emanate from or are associated with the same source."). Several factors to consider in determining secondary meaning include: whether actual purchasers of the Dogloo igloo associate the igloo configuration with Dogloo; the degree and manner of Dogloo's advertising; the length and manner of Dogloo's use of the configuration; and whether Dogloo's use of the configuration has been exclusive. *Clamp Mfg.,* 870 F.2d at 517. Evidence of the amount of money spent in advertising a configuration, and the nature and extent of the advertising is relevant to an inference of secondary meaning. 2 McCarthy § 15.19[2]. In fact, the Ninth Circuit has held that evidence of use and advertising over a substantial period of time are enough to establish secondary meaning. *Id.* Order p. 22, l. 13–20; p. 23, l. 1–17.

8. Dogloo has produced sufficient evidence to make a showing of secondary meaning for its igloo shape. Order p. 22, l. 12–13.

### b. *Functionality*

9. Functional features are not susceptible of protection as trademarks or trade dress. 1 McCarthy § 7.26[1] at 7–113. It is well established that a product shape/configuration which is primarily functional or utilitarian cannot be capable of trademark protection. *Id.* § 6.03[4] at 6–15. Protection for product shapes which are functional is the subject of patent law, not trademark law. *Id.* "The non-functionality requirement of trade dress law was created to avoid a clash with federal patent law. The public policy behind the requirement of non-functionality is that if a configuration is functional, then everyone has the right to use the configuration for its functional purpose, subject only to such exclusive right for a *limited* time as may exist under the patent laws." *Id.* Thus, functional features cannot be registered trademarks because such extended protection would hinder fair competition. "Functionality is a potent public policy, for it trumps all evidence of actual consumer identification of source, and all evidence of actual consumer confusion by the imitator." *Id.* at 7–110. Order p. 13, l. 3–21.

10. A product feature is functional if it is essential to the product's use or if it affects the quality of the article. *See Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837 (9th Cir.1987). The following factors should be considered in analyzing a trade dress to determine functionality: 1) whether a particular design yields a utilitarian advantage; 2) whether alternative designs are available in order to avoid hindering competition; and 3) whether the design achieves economies in manufacture and use. *International Jensen,* 4 F.3d at 823. In addition, the following factors commonly serve as evidence of functionality: 1) the existence of a utility patent which discloses the utilitarian advantages of the design; 2) the existence of any advertising or promotion of the trademark owner which touts the functional advantages of the design; and 3) whether or not the design results from a comparatively simple, cheap or superior method of manufacturing the article. 1 McCarthy § 7.26[3][e] at 7–128. Order p. 13, l. 22–28; p. 14, l. 1–11.

### 1) *Alternative Designs*

11. The existence of actual or potential alternative designs that work equally well strongly suggests the particular design used by plaintiff is neither functional nor needed by competitors to effectively compete

on the merits. *In re Honeywell, Inc.,* 8 U.S.P.Q.2d 1600 (T.T.A.B.1988). "A design is functional only if certain functional benefits cannot be duplicated through the use of other designs." 1 McCarthy § 7.26[3][e] at 7–132. If there are a reasonable number of alternatives, then the grant of an exclusive trade dress right to one of those alternatives will not impair free competition. *Id.* Thus, a Court must determine whether alternative means of performing the same function equally well are available in sufficient number such that trademark protection for one of those means will not unduly impair competition. *Id.* One can produce evidence that the same function can be performed by a variety of alternative designs with no significant sacrifice in utility through the presentation of hypothetical designs created by an expert witness designer. *Id.* at 7–133. Order p. 16, l. 24–28; p. 17, l. 1–15.

12. The fact that other designs are available is not dispositive. Rather, the issue is whether equally functional alternatives exist that are as easily and cheaply manufactured as plaintiff's product. *Mountain Safety Research v. Coleman Outdoor Prods.,* 869 F.Supp. 818 (W.D.Wash.1993). Order p. 18, l. 4–8.

13. For purposes of this motion only, the Court is persuaded that there are sufficient alternatives to the igloo shape to allow reasonable competition. Accordingly, this evidence of alternative configuration weighs in favor of Dogloo's ability to prove the nonfunctionality of its igloo shape. Order p. 18, l. 26–28; p. 19, l. 1–4.

### 2) *Dogloo Utility Patent*

14. It is clear the igloo design is referenced in the claim language and is depicted in one or more figures disclosed in the '729 patent. However, such references are not dispositive. Not every configuration disclosed in a utility patent is automatically classified as primarily functional. 1 McCarthy § 7.29 at 7–170 (citing *Best Lock Corp. v. Schlage Co.,* 413 F.2d 1195 (CCPA1969). ("[A] patent may not be evidence of functionality in regard to things of a ... mere design nature which happen to be disclosed in the patent but which are not attributed any func-

tional significance therein.") A utility patent must therefore be examined in detail to determine whether the disclosed configuration is really primarily functional or just incidentally appears in the disclosure of the patent. 1 McCarthy § 7.29 at 7–171 citing *Black & Decker Inc. v. Hoover Service Center,* 886 F.2d 1285 (Fed.Cir.1989). Order p. 15, l. 4–18. There is no doubt that many non-functional shapes and configurations happen to be described or pictured as an incidental detail in functional patents. 1 McCarthy § 7.29 at 7–171. Order p. 15, fn. 6.

15. A careful review of Dogloo's utility patent reveals that the patent does not attach any particular functional significance to the igloo configuration itself. Thus, the existence of a utility patent is not particularly probative of the functionality of the igloo configuration. Order p. 15, l. 19–21; Order p. 16, l. 21–23.

### 3) *Dogloo's Advertising*

16. While Dogloo's ads tout the functional features of the igloo configuration, such evidence is not dispositive, given the evidence of alternative designs which effectively imitate the functional features of the Dogloo igloo. Order p. 20, l. 5–9.

17. The Court finds that Dogloo has produced sufficient evidence to demonstrate that it has a fair chance of successfully proving that its igloo configuration is not functional. Thus, for purposes of this motion, the Court finds the igloo design is non-functional and that Dogloo's federally registered trademark is valid. Order p. 20, l. 14–19.

### c. *Likelihood of Confusion*

18. Determining whether confusion is likely between Dogloo's Dogloo igloo pet shelter and Doskocil's DOME HOME pet shelter involves an analysis of the following factors: 1) evidence of actual confusion; 2) the degree of similarity between the marks; 3) the proximity of the goods; 4) the marketing channels used; 5) the degree of care likely to be exercised by purchasers; 6) the defendant's intent in selecting the mark; and 7) the strength of mark. *Clamp Mfg.,* 870 F.2d at 517. Order p. 24, l. 20–28; p. 25, l. 1.

19. After assessing all the evidence presented by the parties, the Court finds that Dogloo has met its burden of demonstrating a likelihood of success at trial on the merits of its trademark infringement claim. Order p. 27, l. 9–13.

#### d. *License/Release Agreement*

20. Under the License/Release Agreement, Dogloo licensed Contico under the '729 patent and released Contico from any liability arising from the manufacture of the claimed invention. Order p. 2, l. 24–26.

21. The Court agrees with Doskocil that Missouri law governs the contract's interpretation because the License/Release Agreement was to be performed and executed in Missouri. See Cal.Civ.Code § 1646; *Gitano Group Inc. v. Kemper Group*, 26 Cal.App.4th 49, 31 Cal.Rptr.2d 271 (1994). Because the court finds that the language of the agreement is unambiguous, it will not consider the parole evidence offered by Dogloo. Order p. 8, l. 10–16.

22. It is important to differentiate between the Agreement's release and license provisions. The license provisions appear in paragraphs 2–4 and 6 of the Agreement. The release provisions appear in paragraphs 5, 7 and 8. With respect to the license provisions, it is clear to the Court, and neither party disputes, that the Agreement expressly grants Contico, and thereby Doskocil, a license to make, use and sell the claimed invention in Patent No. 4,962,729 (structural foam dog house). Paragraph 3 of the Agreement states "DOGLOO hereby grants CONTICO an irrevocable, ... license under U.S. Patent No. 4,962,729 ... to make, have made for it, use and sell the claimed invention." This language clearly evidences Doskocil's license to use Patent No. 4,692,729. Paragraph 6 also confirms the patent license stating:

> This Agreement does not convey or license any patent, trademark, or trade dress rights belonging to either party *except* as expressly set forth in this Agreement.

(Exh. 621, p. 2, attached to Strong Decl.) (emphasis added.) Because paragraph 3 "expressly" grants Contico a license under Patent No. 4,692,729, Doskocil is clearly licensed

to use Patent No. 4,692,729. Paragraph 6 also demonstrates that Dogloo did not expressly grant Contico a license to its trade dress rights, as no other paragraph in the Agreement expressly sets forth such a license. Order p. 8, l. 17–28; p. 9, l. 1–13.

23. Paragraph 5 is a release provision in which Dogloo agrees not to allege against Contico the infringement of any patent, trademark, or trade dress rights in the then existing design of the animal shelter shown in Exhibit B. The animal shelter in Exhibit B is Contico's Tuff dog house. Thus, the covenant in paragraph 5 specifically relates to infringement claims against the Tuff dog house and therefore is not relevant to any rights Doskocil has in its current dome-shaped dog houses. Order p. 9, fn. 4.

24. Paragraph 7 of the Agreement indicates that Dogloo released Contico, and consequently Doskocil, from any and all liability arising out of any and all matters relating to the manufacture, use and sale of the claimed invention. Paragraph 7 is a release provision pertaining to the "claimed invention" under the '729 patent. It states:

> DOGLOO hereby forever releases and discharges CONTICO, and its directors, officers, attorneys, agents, employees, suppliers, and customers from any and all liability of any kind whatsoever arising out of any and all matters raised in this Complaint filed in the above-identified Civil Action, and any and all matters relating to CONTICO's manufacture, use and sale of the *claimed invention.*

(Exh. 621, p. 2 attached to Strong Decl.) (emphasis added.) Order p. 9, l. 14–21; p. 10, l. 1–10.

25. Doskocil points to Claims 1, 2, 12 and 13 to demonstrate that the patent incorporates the functional features of the igloo design itself. Claim 1 requires the pet shelter to include a "molded unitary thermoplastic shell" which defines a "cavity for sheltering said animal." Exh. 622 at p. 6. Claim 2 requires the shelter to include a generally flat base. *Id.* Claim 12 requires the shelter to have a concave interior surface. *Id.* at 7. Claim 13 requires the shelter to have an

arcuate doorway. *Id.* Order p. 14, l. 21–28; p. 15, l. 1–2.

26. However, as discussed above, Dogloo has presented sufficient evidence of alternative design configurations which embody the functional attributes of the claimed invention without utilizing the igloo shape. Exhs. 236–250 attached to Meek's Decl. The Court therefore concludes that the patent does not dictate that the claimed invention use the igloo configuration and that the igloo configuration is not the "claimed invention" as referenced in the License/Release Agreement. Order p. 15, l. 19–24; p. 16, l. 1–21.

27. The License/Release Agreement does not bar Dogloo's trademark infringement claims for purposes of this motion under either a theory of contractual release of liability or equitable estoppel. Order p. 20, l. 22–23; p. 21, l. 1.

### e. *The Z Daug Haus*

■ 28. The Court is in agreement with those decisions which find that a sales volume which is so "small, sporadic, and inconsequential" is considered de minimis for priority purposes. *Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 929 (8th Cir.1967); *Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531 (2nd Cir.1964). Order p. 28, fn. 15.

29. The Court finds Dogloo has presented sufficient evidence, for purposes of this motion, to demonstrate a fair likelihood that any prior sales of the Z Daug Haus pet shelter were so small or inconsequential that they are de minimis for purposes of priority. Order p. 28, fn. 15.

30. However, in an abundance of caution, the Court will exclude the state of Idaho from the preliminary injunction ordered herein. Order p. 28, fn. 15.

■ 31. After assessing all of the evidence presented by the parties, the Court rejects Doskocil's defenses and finds Dogloo has met its burden of demonstrating a likelihood of success at trial on the merits of its trademark infringement claims. Order p. 27, l. 14–17.

### C. *Irreparable Harm/Balance of Hardship*

■ 32. In addition to demonstrating likelihood of success on the merits, a plaintiff seeking a preliminary injunction must also show the possibility of irreparable injury if relief is not granted or that the balance of hardships weighs in its favor. Dogloo claims it will be irreparably harmed if Doskocil is permitted to sell its DOME HOME pet shelter because Dogloo will lose its exclusive control over the symbol of its reputation. The Ninth Circuit has held that in trademark cases, once the plaintiff establishes a likelihood of confusion between the plaintiff's mark and the defendant's, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted. *International Jensen,* 4 F.3d at 827 (citing *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609 (9th Cir.1989)). Order p. 28, l. 3–11; p. 29, l. 1–5.

33. The Court finds Doskocil has not successfully rebutted this presumption. Order p. 29, l. 6–7.

■ 34. In addition to monetary damage, it is logical to infer that Dogloo would suffer incalculable harm to its goodwill and reputation if it lost exclusive control over the igloo configuration. *See Apple Computer, Inc. v. Formula Int'l, Inc.,* 725 F.2d 521, 526 (9th Cir.1984) ("Once Apple demonstrated a likelihood of success on the merits of its trademark infringement claim, the district court could have reasonably concluded that continuing infringement would result in loss of control over Apple's reputation and loss of goodwill."). Order p. 29, l. 16–24.

35. In the absence of evidence documenting the amount of income attributable to the DOME HOME pet shelter and given the wide array of pet products produced by Doskocil, the Court is unpersuaded that the loss of DOME HOME sales for several months would place Doskocil in default under its lending agreements. Order p. 30, l. 7–11.

36. Doskocil has more opportunity to diversify any loss it suffers than Dogloo. Moreover, an injunction would not enjoin Doskocil from using its license to make a structural foam dog house or alternative configurations which are functionally equivalent

to the Dogloo igloo pet shelter. An injunction would only prohibit Doskocil's use of the particular dome configuration utilized by Dogloo. Order p. 30, l. 14–19.

37. The Court finds that the balance of hardships weighs in favor of Dogloo. Order p. 30, l. 21–22.

38. For all the reasons stated above, the Court finds Dogloo has met its burden of demonstrating a likelihood of success on the merits, irreparable injury and the balance of hardship in its favor. Accordingly, Dogloo's motion for a preliminary injunction is GRANTED. Order p. 30, l. 23–28.

39. To the extent any Findings of Fact are deemed to be Conclusions of Law, they are hereby incorporated into these Conclusions of Law.

## III. *ORDER*

This Court, having considered the submissions of the parties and oral argument, hereby orders and decrees, pursuant to Rule 65 of the Federal Rules of Civil Procedure, that Defendant, Doskocil Manufacturing Co., Inc. ("Doskocil"), and its officers, agents, servants, employees, attorneys, representatives, successors and assigns, and all others acting in concert or participation with Doskocil who receive actual notice of this Order are hereby preliminarily enjoined, directly or indirectly, from:

Selling, offering for sale, advertising, promoting, displaying, shipping, marketing, or otherwise disposing of pet shelters having a configuration as depicted in Exhibit A hereto, otherwise known as the Dosckocil DOME HOME pet shelter or any shelter using the same configuration as the Dogloo igloo pet shelter as depicted in Exhibit B hereto, or in U.S. Registration No. 1,631,630, Exhibit C hereto.

This injunction is not effective within the State of Idaho or outside the United States. Pending final judgment in this matter, Doskocil may continue to sell pet shelters, as defined above, to resellers or consumers located in Idaho and outside of the United States.

IT IS FURTHER ORDERED that pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, service of a copy of this Order shall be made upon the Defendant or upon its attorneys of record by any person acting under the supervision of Plaintiff's attorneys, Knobbe, Martens, Olson & Bear, over the age of eighteen (18) years and not a party to this action, on or before 5:00 p.m. on April 20, 1995, and the same is hereby deemed good and sufficient service.

IT IS FURTHER ORDERED that Plaintiff shall post an injunction bond in cash or written by a corporate surety qualifying under the Local Rules of this Court, in the sum of $400,000.00, for payment of such costs and damages as may be incurred by Defendant in the event it be found the Defendant has been wrongfully enjoined. Such bond to be filed with the Clerk of this Court no later than 3:00 p.m. on April 20, 1995. This injunction will go into effect once the required injunction bond is given pursuant to Federal Rule of Civil Procedure 65(c).

EXHIBIT A

**DOSKOCIL PET SHELTER**

EXHIBIT B

**DOGLOO PET SHELTER**