**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 96-60413
No. 96-60540

_____


SUNBEAM PRODUCTS, INC.,

Plaintiff-Appellee,

VERSUS

THE WEST BEND COMPANY,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Mississippi

_____

September 15, 1997

Before JOLLY, SMITH, and DENNIS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


The West Bend Company challenges a preliminary injunction entered pursuant to the Lanham Act, 15 U.S.C. § 1125(a). Finding no reversible error, we affirm.


I.

Sunbeam Products, Inc. ("Sunbeam"), sued The West Bend Company ("West Bend"), requesting injunctive relief to bar West Bend from manufacturing and marketing a stand mixer, Model No. 41012 ("West Bend Mixer #1"). The complaint alleged that West Bend Mixer #1

unlawfully replicated the product configuration of a stand mixer made by Sunbeam, the "American Classic Mixmaster®," Model No. 2360.

Sunbeam alleged that the manufacture and sale of West Bend Mixer #1 violated the Lanham Act, 15 U.S.C. § 1125(a); the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c); and the common law of unfair competition, trade dress infringement, dilution, and false and misleading advertising. To demonstrate that West Bend had unlawfully replicated its product configuration, Sunbeam identified six "key design features" in the American Classic Mixmaster® that, when taken in combination, allegedly distinguish the Sunbeam mixer from all other commercially available stand mixers:

(1) a distinctive "torpedo-shaped" housing configuration with a rounded rear-mounted speed control dial that conforms to the shape of the housing;

(2) a distinctive handle attached to the front of the housing that arches over the housing and terminates in the space above the housing;

(3) a distinctive beater-eject button located on the left side of the housing beneath the handle;

(4) a distinctive "tear-drop shaped" face plate on the front of the housing;

(5) a distinctive horizontal stripe or groove along the side of the housing; and

(6) a distinctive combination of black and white features.

The district court granted a temporary restraining order ("TRO") on April 12, 1996, enjoining West Bend from marketing any products embodying the Mixmaster® product design trademark or

2

similar designs or using any other mark or device likely to dilute the distinctive quality of the Mixmaster® product design and the Sunbeam trademark. In particular, the court enjoined West Bend from marketing West Bend Mixer #1, or displaying it at a pending Gourmet Show in San Francisco on May 4-8, 1996. West Bend filed a motion to quash the TRO, leading the court to dissolve it on April 16, 1996. Nevertheless, the court set a hearing for April 30 to consider the motion for preliminary injunction.

Following the hearing, the court granted Sunbeam's request for a preliminary injunction on May 3, 1996, reinstating the injunction against West Bend Mixer #1. The preliminary injunction substantially reinstated the terms of the TRO.

West Bend filed an emergency motion to clarify the injunction, proposing an alternative design for the mixer ("West Bend Mixer #2"). On May 6, the court ruled that West Bend Mixer #2 also violated the Sunbeam trademark and was likewise prohibited by the preliminary injunction, but the court suggested that West Bend could escape the injunction by modifying the speed control dial.[1] **The court modified the terms of the preliminary injunction to reflect this ruling on May 14.**

**West Bend redesigned the stand mixer in an effort to comply, and the new design ("West Bend Mixer #3") was presented to the court on May 13-14. On May 14, the court further modified the terms of the preliminary injunction to bar West Bend Mixer #3. The**

---

[1] In addition, the court required West Bend to make two future modifications: (1) eliminate the "middle-up arced" handle curvature by August 31, 1996; and (2) remove and redesign the face plate by December 31, 1996.

court approved a design incorporating additional modifications, which subsequently was marketed by West Bend ("West Bend Mixer #4"). The most prominent difference between West Bend Mixer #3 and #4 was the elimination of mixing speed terms from the speed control dial (e.g., "mix," "beat," "stir," and "blend").

Finally, on May 23, the court entered an order and findings summarizing the scope of the preliminary injunction. West Bend filed a notice of appeal from the preliminary injunction, the two orders modifying it, and the final order and findings.

On July 31, 1996, West Bend submitted to the district court its design for the next generation of mixers ("West Bend Mixer #5"). On August 6, the court ruled that West Bend Mixer #5 was prohibited by the preliminary injunction, but approved a design that incorporated the nondescript speed control dial of Mixer #4 ("West Bend Mixer #6").

On August 12, West Bend filed a notice of appeal from the August 6 order, and the cases were consolidated. We have jurisdiction over these cases under 28 U.S.C. § 1292(a)(1), which authorizes interlocutory appeal from preliminary injunctions.

## II.

A preliminary injunction is an extraordinary equitable remedy that may be granted only if the plaintiff establishes four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury

4

outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *See Blue Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989). These four elements are mixed questions of law and fact. Accordingly, we review the factual findings of the district court only for clear error, but we review its legal conclusions *de novo*. Likewise, although the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, a decision based on erroneous legal principles is reviewed *de novo*. *Id.*[2]

## III.

The Lanham Act, 15 U.S.C. § 1125(a), creates a cause of action for trade dress infringement, analogous to the common law cause of action for unfair competition. "Trade dress" refers to the total image and overall appearance of a product. *Blue Bell*, 864 F.2d at 1256.[3] The protection of trade dress is tantamount to trademark protection:

---

[2] *See also Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 344 (5th Cir. 1984) ("If the trial court misapplies the governing legal standards, however, the 'clearly erroneous' standard is inapplicable.").

[3] "Trade dress" may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992) (citing *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983)). Accordingly, the inquiry does not focus on isolated elements of the dress, but on whether a combination of features creates a distinctive visual impression, identifying the source of the product. *Falcon Rice Mill*, 725 F.2d at 346; *accord Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1118-19 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992). Thus, "[t]he whole, in trademark law, is often greater than the sum of its parts." *Association of Coop. Members, Inc. v. Farmland Indus., Inc.*, 684 F.2d 1134, 1140 (5th Cir. 1982); *accord Taco Cabana*, 932 F.2d at 1120.

> Protection of trade dress, no less than of trademarks, serves the Act's purpose to "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of a good reputation."

*Two Pesos,* 505 U.S. at 774 (citations omitted).[4]

To demonstrate an unlawful trade dress infringement, the plaintiff must first establish that the trade dress qualifies for trade dress protection. This inquiry encompasses three issues: (1) distinctiveness, (2) secondary meaning, and (3) functionality.[5] If the court concludes that the trade dress is protected, the plaintiff must demonstrate that it has been infringed. "Infringement occurs only when there is a likelihood of confusion between the products of the plaintiff and the defendant." *Blue Bell*, 864 F.2d at 1256; *accord Taco Cabana*, 932 F.2d at 1118-19.

---

[4] Accordingly, because the Lanham Act "provides no basis for distinguishing between trademark and trade dress," *Two Pesos,* 505 U.S. at 773, the test for trade dress protection is identical to that for trademark protection. "[T]he protection of trademarks and trade dress under § 43(a) serves the same statutory purpose of preventing deception and unfair competition. There is no persuasive reason to apply different analysis to the two." *Id*.

[5] To warrant protection under the Lanham Act, a particular mark or product characteristic must distinguish the product from products manufactured by others. *See Two Pesos,* 505 U.S. at 768. Some marks are "inherently distinctive" and automatically entitled to trademark protection. Others, however, are not inherently distinctive, but are merely descriptive of a certain product. Nevertheless, even marks that are not inherently distinctive may become uniquely associated with a particular source, thereby acquiring a "secondary meaning." *Id*. at 766 n.4. "The general rule regarding distinctiveness is clear: An identifying mark is distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Id*. at 769.

Secondary meaning entitles a mark or trade dress to trademark protection, despite the absence of an inherently distinctive characteristic. Accordingly, a plaintiff need not demonstrate that a product has acquired a secondary meaning if the mark is inherently distinctive, thereby entitling it to protection *per se*. *Id*. at 773-74.

To establish that the product configuration of the American Classic Mixmaster® merits trademark protection, therefore, Sunbeam must demonstrate that the product configuration is either inherently distinctive or has acquired a secondary meaning, and that this distinctive product configuration is not functional. If a trade dress is functional, it does not merit protection, even if it is inherently distinctive or has acquired secondary meaning. *Two Pesos,* 505 U.S. at 775.[6] If the product configuration of the American Classic Mixmaster® warrants trade dress protection, Sunbeam also must demonstrate a likelihood of confusion, in order to prevail on its claim of trade dress infringement under the Lanham Act.

**A.**

As a threshold matter, we must determine whether the product configuration of the American Classic Mixmaster® merits protection, either because the product configuration is inherently distinctive or because it has acquired a secondary meaning. We now examine these various considerations.

**1.**

For purposes of trademark law, marks or product features

_____

[6] "[A] design is legally functional, and thus unprotectible, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection." *Two Pesos,* 505 U.S. at 775. "'[A] product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995) (quoting *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844, 850 n.10 (1982)).

7

traditionally have been arranged into five categories: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. *Two Pesos,* 505 U.S. at 768.[7]  This hierarchy determines the degree of trademark protection to which a given mark is entitled.  The latter three categories are considered inherently distinctive, "because their intrinsic nature serves to identify a particular source of a product."  *Id*.

In contrast, marks that are merely descriptive of a product are not considered inherently distinctive, "because they do not inherently identify a particular source."  *Id*. at 769. Accordingly, descriptive marks are entitled to protection only if they have come to be uniquely associated with a particular source, thereby acquiring a "secondary meaning."  *Id*. at 766 n.4.  Finally, generic marks are not protected under any circumstances, because they refer not to a particular product or manufacturer, but solely to "the genus of which the particular product is a species."  *Id*. at 768 (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)).

As this hierarchy illustrates, the essence of a protected mark

---

[7] *See also Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976) (defining these five categories for purposes of trademark law). Although these classifications were first coined in the context of trademark law, they have also been applied to cases involving trade dress.  *See Two Pesos,* 505 U.S. at 773 (approving the application of the *Abercrombie* classifications to trade dress litigation)*; Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 702 (5th Cir. Unit A Oct. 1981) (holding that the same principles that govern trademark law should apply to trade dress litigation).  "Thus, a trade dress feature is distinctive if it is arbitrary or fanciful, and not descriptive or functional.  Functional features cannot be protected, and merely descriptive features must have acquired secondary meaning before qualifying for protection."  *Sicilia Di R. Biebow & Co. v. Cox*, 732 F.2d 417, 426 (5th Cir. 1984).

is its capacity to distinguish a product and identify its source. The gravamen of trademark law is source identification. Therefore, a given mark or trade dress is "inherently distinctive" only if it is "sufficiently distinctive of itself to identify the producer." *Chevron*, 659 F.2d at 702; *accord Sicilia Di R. Biebow*, 732 F.2d at 426. "Trade dress is inherently distinctive when, by its 'intrinsic nature,' it identifies the particular source of the product." *Imagineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1263-64 (Fed. Cir.), *cert. denied*, 116 S. Ct. 277 (1995).[8]

Insofar as product configurations are fundamentally different from trademarks and trade dress, there is some question whether a product configuration can ever be deemed "inherently distinctive." *See Duraco Prod., Inc. v. Joy Plastic Enter.*, 40 F.3d 1431, 1445-46 (3rd Cir. 1994).[9] Unlike traditional trademarks and trade dress,

---

[8] "If a mark or dress serves as a symbol of origin it is considered distinctive and protectable. Unless a mark or dress is deemed 'inherently' or 'sufficiently' distinctive, however, secondary meaning must be established." *Sno-Wizard Mfg. v. Eisemann Prod. Co.*, 791 F.2d 423, 425 n.2 (5th Cir. 1986); *accord Taco Cabana*, 932 F.2d at 1119-20. *See also Duraco Prods.*, 40 F.3d at 1442 (explaining that "inherently distinctive trade dress is protected because presumptively it primarily identifies the product's source").

[9] Although product configurations technically are regarded as trade dress, critics distinguish product configurations and designs from product packaging, which is more closely associated with traditional trademark law. *See*, *e.g.*, *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1007-08 (2d Cir. 1995); *Duraco Prods.*, 40 F.3d at 1448; *see also Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 378-79 (2d Cir. 1997) (discussing the *Knitwaves* interpretation); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 16 cmt. b (1995).

> Product packaging designs, like trademarks, often share membership in a practically inexhaustible set of distinct but approximately equivalent variations, and an exclusive right to a particular overall presentation generally does not substantially hinder competition in the packaged good, the item in which a consumer has a basic interest. A product configuration, contrariwise, commonly has finite competitive variations that, on the whole, are equally acceptable to consumers.

(continued...)

9

which function primarily to identify the source of a given product, the primary purpose of product configuration is not identification. Accordingly, as the Third Circuit stated, "one cannot automatically conclude from a product feature or configuration§§as one can from a product's arbitrary name, for example§§that, to a consumer, it functions primarily to denote the product's source." *Id*. at 1441.[10]

Hence, some commentators have suggested that product configurations can never be considered "inherently distinctive."[11] Nevertheless, we need not reach this controversial question in the instant case, because the product configuration of the American Classic Mixmaster® has acquired a secondary meaning.

---

(...continued)

*Duraco Prods*., 40 F.3d at 1448. *But see Stuart Hall Co. v. Ampad Corp*., 51 F.3d 780, 787-88 (8th Cir. 1995) (criticizing the distinction between product packaging and product configuration for purposes of trade dress law).

[10] An arbitrary or fanciful mark or dress is presumed, as a matter of law, to achieve consumer recognition immediately upon its adoption and use, because the primary function of the mark or dress is source identification. In contrast, a product configuration cannot generally warrant a presumption of identification, "as consumers usually appreciate a product's configuration for its contribution to the inherent appeal of the product, not (in the absence of secondary meaning) its signifying function." *Duraco Prods*., 40 F.3d at 1441.

[11] *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 16 cmt. b (1995) (noting that product designs are not ordinarily considered inherently distinctive and may be protected only upon proof of secondary meaning); J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 8.12 (4th ed. 1997) (collecting conflicting authorities). Indeed, this court has also suggested that a product configuration cannot be inherently distinctive. *See Sicilia Di R. Biebow*, 732 F.2d at 426 n.7 ("*Unlike a product's configuration*, which may acquire trademark value over time and by exposure to consumers, arbitrary and nonutilitarian trade dress or packaging usually is designed to act immediately as an identifier of source.") (emphasis added). *But see Two Pesos,* 505 U.S. at 772-75 (assuming *arguendo* that a product configuration may be inherently distinctive); *Duraco Prods*., 40 F.3d at 1446 (noting that *Two Pesos* must be read as "giving an imprimatur to finding trade dress in a product configuration to be inherently distinctive under certain narrow circumstances"); *Sicilia Di R. Biebow*, 732 F.2d at 425 n.3 ("The same [distinctiveness] principles apply in the context of trade dress, although selection is from designs and configurations, not words.").

Assuming *arguendo* that the unique product configuration of the American Classic Mixmaster® cannot be deemed inherently distinctive, the district court did not err in concluding that it has acquired secondary meaning, for purposes of the preliminary injunction test. A mark or product feature has acquired secondary meaning if it "has come through use to be uniquely associated with a specific source." *Two Pesos*, 505 U.S. at 766 n.4; *accord* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 13 cmt. e (1995). The determination that a feature has acquired secondary meaning is a finding of fact, which we review for clear error. *Sno-Wizard*, 791 F.2d at 427.

Because the primary element of secondary meaning is "'a *mental association* in buyer's minds between the alleged mark and a single source of the product,'" the determination whether a mark or dress has acquired secondary meaning is primarily an empirical inquiry. *Sicilia Di R. Biebow*, 732 F.2d at 425 n.4 (citation omitted). This court has expressly stated, and the Supreme Court has agreed, that the gravamen of the secondary meaning determination is "'the empirical question of current consumer association.'" *Taco Cabana*, 932 F.2d at 1120 n.7 (quoted in *Two Pesos*, 505 U.S. at 770). Accordingly, survey evidence is the most direct and persuasive evidence of secondary meaning. *Sno-Wizard*, 791 F.2d at 427.[12] In

---

[12] "To establish secondary meaning, a manufacturer must show that, *in the minds of the public*, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Lab.*, 456 U.S. at 851 n.11 (1982) (emphasis added).

the instant case, Sunbeam introduced no survey evidence to prove that the "key design features" of the American Classic Mixmaster® have acquired secondary meaning.[13]

To compensate for the absence of empirical survey evidence, Sunbeam proffered a variety of evidence to show secondary meaning. We have recognized that consumer surveys are not the only evidence relevant to the determination of secondary meaning. In addition, the court may consider the length and manner of the use of a mark, the nature and extent of advertising and promotion of the mark, the sales volume of the product, and instances of actual confusion. *See Bank of Tex. v. Commerce Southwest, Inc.*, 741 F.2d 785, 787 (5th Cir. 1984). Nevertheless, the ultimate determination whether a particular mark or dress has acquired secondary meaning remains an empirical question of consumer association. *See id*. at 787-89.

In support of its claim, Sunbeam offered evidence documenting the evolution of the American Classic Mixmaster®, consumer testimonials, and the sales and marketing history of Sunbeam stand mixer designs, contending that this product pedigree warrants a presumption of secondary meaning. While this evidence is relevant to the inquiry, it does not establish the requisite consumer association between the product configuration of the American Classic Mixmaster® and the source of the product.

---

[13] Sunbeam explains that the district court proceedings were conducted with a sense of urgency, as a result of the impending Gourmet Show in San Francisco. Therefore, Sunbeam did not have time to compile survey data to prove its case. While this explanation would not excuse the omission of empirical data at trial, it is precisely the sort of contingency that the lower burden of proof governing preliminary injunctions is intended to accommodate, as this case illustrates.

In concluding that the American Classic Mixmaster® has acquired secondary meaning, the district court relied solely on the pedigree of the current model. Noting that the American Classic Mixmaster® has evolved from stand mixers marketed by Sunbeam since 1930, the court inferred that the design has acquired secondary meaning.

Evidence of long use is insufficient to prove secondary meaning, however, without empirical proof that the design "has come through use to be uniquely associated with a specific source." *Two Pesos*, 505 U.S. at 766 n.4.[14] The district court erred by assuming that the long and distinguished pedigree of the American Classic Mixmaster®, without more, is sufficient to demonstrate secondary meaning.[15]

Were this case presented for review following final judgment, we would be constrained to hold that Sunbeam had not demonstrated that the American Classic Mixmaster® has acquired secondary meaning entitling its product configuration to trade dress protection. Review of a preliminary injunction is more circumscribed, however.

To be entitled to a preliminary injunction, Sunbeam need only

---

[14] *See also Bank of Tex.,* 741 F.2d at 788 (disavowing that "length of time alone is sufficient to establish secondary meaning").

[15] This is particularly true where, as here, the alleged secondary meaning is founded upon a product configuration, rather than upon a traditional mark or dress, because "consumers do not associate the design of a product with a particular manufacturer as readily as they do a trademark or product packaging trade dress." *EFS Mktg., Inc. v. Russ Berrie & Co.*, 76 F.3d 487, 491 (2d Cir. 1996); *see also Duraco Prods.*, 40 F.3d at 1448 (opining that "a consumer is substantially more likely to trust a product's packaging, rather than its configuration, as an indicium of source"). Therefore, the mere fact that a certain product configuration has a long pedigree does not warrant a presumption of secondary meaning.

13

show "a substantial likelihood of success on the merits." In this case, the distinction is dispositive. While the evidence upon which the district court relied would not be sufficient to support a judgment of trade dress infringement warranting final injunctive relief, we conclude that it is sufficient to warrant a preliminary injunction.

The general principles qualifying a mark or trade dress for registration as a trademark, under the registration provisions of the Lanham Act, are likewise applicable to the determination whether an unregistered mark is entitled to trademark protection. *See Two Pesos*, 505 U.S. at 768. The Lanham Act permits the registration of marks that have acquired a secondary meaning, and states that

> [t]he Commissioner may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of [acquired] distinctiveness is made.

15 U.S.C. § 1052(f).

This statutory presumption is relevant to the instant case. The district court concluded that the external appearance of the American Classic Mixmaster® has not changed in over seventeen years and found that the other mixers on the market do not "even closely resemble the overall appearance of the Sunbeam Mixmaster® mixer." This finding of fact is not clearly erroneous and is sufficient to demonstrate "substantially exclusive and continuous use" of the

14

"key design features" ascribed to the American Classic Mixmaster®.[16]

Therefore, the district court was entitled to accept this evidence as prima facie evidence of secondary meaning. 15 U.S.C. § 1052(f); *Stuart Hall Co.*, 51 F.3d at 789. Under these circumstances, although the evidence is not conclusive, Sunbeam has demonstrated a substantial likelihood of success on the merits of its trade dress infringement claim.


## B.

Having concluded that the unique product configuration of the Sunbeam American Classic Mixmaster® has acquired secondary meaning, we must determine whether that product design is functional. If a product characteristic is functional, it is not entitled to trade dress protection. *See Two Pesos,* 505 U.S. at 775. The functionality doctrine is the great countervailing factor in trademark law, balancing the interest in facilitating innovation against the interest in fostering competition in the free market. "The doctrine acts to separate those configurations that may be protected as property rights or trademarks and those designs that the law will not permit any person to appropriate or monopolize." *Sicilia Di R. Biebow*, 732 F.2d at 422.

---

[16] This finding obviates West Bend's claim that the "key design features" of the American Classic Mixmaster® have changed over the long life of the product, and that other manufacturers have used the same features in competing products. It is undisputed that the "key design features" of the American Classic Mixmaster® have remained constant since 1979, and the district court found that no competing manufacturer has adopted an identical product configuration during this period. This evidence is sufficient to show "substantially exclusive and continuous use," for purposes of the Lanham Act, and is prima facie evidence of secondary meaning.

Accordingly, this court has adopted the "utilitarian" standard of functionality, which focuses on the protection of competition. "The ultimate inquiry concerning functionality," we have explained, "is whether characterizing a feature or configuration as protected 'will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods.'" *Id.* at 429 (quoting *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1342 (C.C.P.A. 1982)). In order to be classified as a "functional" characteristic, therefore, a product design or feature must be "superior or optimal in terms of engineering, economy of manufacture, or accommodation of utilitarian function or performance." *Id.*[17]

The Supreme Court has placed its imprimatur on this standard, observing "a design is legally functional, and thus unprotectible, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection." *Two Pesos*, 505 U.S. at 775 (citing *Sicilia*). In a subsequent decision, the Court further observed that "'a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. at 165

---

[17] We have specifically applied the utilitarian standard in the context of product configuration litigation. *See Sno-Wizard*, 791 F.2d 423, 426 n.3 (5th Cir. 1986) (citing *Sicilia Di R. Biebow*).

16

(1995) (quoting *Inwood Labs.,* 456 U.S. 844, 850 n.10 (1982)).[18]

The district court did not err in concluding that the product configuration of the American Classic Mixmaster® is not functional and thus is entitled to protection. For purposes of this analysis, we must distinguish the isolated components of the product from the trade dress, or "total image," of the American Classic Mixmaster®. Even if a product design incorporates certain functional features, we have held that "a particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection." *Taco Cabana*, 932 F.2d at 1119.

Notwithstanding this principle, West Bend argues that Sunbeam may not obtain trade dress protection for a product configuration that includes functional features. This is manifestly not the law. To the contrary, we previously have characterized this argument as a "fallacious syllogism," belied by the principle that an arbitrary combination of functional features may be non-functional. *Id.*[19]. "Trade dress" may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992) (citing *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980

---

[18] This utilitarian theory of functionality, with its focus on competition, lowers the threshold for trade dress protection. "A design that merely assists in a product or configuration's utility is not functional and may therefore be protected." *Sicilia Di R. Biebow*, 732 F.2d at 429.

[19] The case West Bend cites for this proposition, *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571 (Fed. Cir. 1995), is plainly distinguishable from this case. First, *Elmer* concerns a trade dress claim in which every element was functional; as Sunbeam notes, while some features of the American Classic Mixmaster® might be functional, others plainly are not (e.g., color combinations, aesthetic handles). This distinction is critical, as the trade dress of a product entails its "total image" and "overall appearance." *Blue Bell*, 864 F.2d at 1256.

(11th Cir. 1983)).

Accordingly, the inquiry does not focus on isolated elements of the dress, but on whether a combination of features creates a distinctive visual impression, identifying the source of the product. *Falcon Rice Mill v. Community Rice Mill*, 725 F.2d 336, 346 (5th Cir. 1984); *accord Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1118-19 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992). Thus, "[t]he whole, in trademark law, is often greater than the sum of its parts." *Association of Coop. Members, Inc. v. Farmland Indus., Inc.*, 684 F.2d 1134, 1140 (5th Cir. 1982); *accord Taco Cabana Int'l, Inc.*, 932 F.2d at 1120.[20]

Likewise, the fact that the American Classic Mixmaster® incorporates functional features named in utility patents does not compel the conclusion that the product configuration is legally functional. Insofar as the trade dress of a product entails its "total image" and "overall appearance," *Blue Bell*, 864 F.2d at 1256, an arbitrary combination of functional features may nevertheless be non-

---

Second, the trade dress in *Elmer* was coextensive with a utility patent, which incorporated every element of the trade dress. Under these circumstances, the Federal Circuit feared that trade dress protection would effectively extend the life of the patent after its formal expiration. *See Elmer*, 67 F.3d at 1580. In contrast, the trade dress claim in the instant case entails a combination of several features, with individual utility patents granted to certain features. In this regard, the principle that trade dress is the "total image" of a product, rather than its isolated components, is dispositive. Unlike the situation in *Elmer*, granting trade dress protection to the arbitrary product configuration of the American Classic Mixmaster® would not restrict any competitors from copying the individual functional features after the individual utility patents have expired, but would simply prohibit competitors from copying the arbitrary combination of features embraced in the American Classic Mixmaster®. Hence, there is no conflict between patent law and trademark law in the instant case.

Finally, the proposition that a unique combination of functional features is functional *per se*, despite the absence of any adverse effect on competition, is incompatible with the utilitarian functionality doctrine of the Fifth Circuit. It is also flatly inconsistent with the established rule that a particular arbitrary combination of functional features, the combination of which is not functional, is entitled to trade dress protection. *See Taco Cabana*, 932 F.2d at 1119.

functional for purposes of trade dress protection.[21]  Therefore, West Bend's arguments are without merit.

The district court acknowledged that, when viewed in isolation, certain "key design features" of the American Classic Mixmaster® might be considered functional.  Nevertheless, the court found that "the particular combination of functional features and the way they are arranged and packaged" warranted the conclusion that the "overall shape and configuration is non-functional."  Accordingly, the court properly focused its inquiry on the trade dress, rather than on the isolated components of the product configuration.  *See Taco Cabana*, **932 F.2d at 1118-19.**

Protection of the arbitrary combination of features comprising the American Classic Mixmaster® would not frustrate competition.  West Bend has presented no evidence demonstrating that the product configuration of Model No. 2360 is optimal in terms of engineering, economy of manufacture, or accommodation of utilitarian function.

To the contrary, Sunbeam observes that several other manufacturers compete successfully in the stand mixer market without pirating the unique product configuration of the American Classic Mixmaster®.  Therefore, protection of the Sunbeam design would not impinge upon the rights of others to compete effectively in the sale of goods, the litmus test of functionality.  *See Sicilia Di R. Biebow*, **732 F.2d at 429.**  Consequently, insofar as there are equally efficient options available to competitors, and free competition would not be unduly harmed

---

[21] Furthermore, the mere fact that a feature is named in a utility patent does not automatically render it functional.  Many non-functional configurations are incidentally included in utility patents.  *Dogloo, Inc. v. Doskocil Mfg. Co.*, 893 F. Supp. 911, 919 (C.D. Cal. 1995).

Even if the product configuration of the American Classic Mixmaster® was incidentally illustrated in the utility patents, therefore, this does not compel the conclusion that the design is functional.  "[A] utility patent must be examined in detail to determine whether the disclosed configuration is really primarily functional or just incidentally appears in the disclosure of a patent.  There is no doubt that many non-functional shapes and configurations happen to be described or pictured as an incidental detail in functional patents."  J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:89 (4th ed. 1997).  We conclude that the product configuration of the American Classic Mixmaster® is not a functional part of the utility patents but appears only in incidental detail, without significance for trademark law.

19

by according the product configuration trademark protection, the district court did not err in concluding that the design of the American Classic Mixmaster® is not functional. *See Two Pesos,* 505 U.S. at 775.

## C.

Finally, having determined that the American Classic Mixmaster® is entitled to trade dress protection, we must determine whether that trade dress has been infringed by the West Bend stand mixers. "Infringement occurs only when there is a likelihood of confusion between the products of the plaintiff and the defendant." *Blue Bell,* 864 F.2d at 1256. Likelihood of confusion is a question of fact, which we review for clear error. *Id.* at 1259-60; *Sicilia Di R. Biebow,* 732 F.2d at 430.

In determining the likelihood of confusion, the district court must apply the "digits of confusion" test. The factors to be weighed in this calculus include (1) similarity of the two products; (2) identity of retail outlets and purchasers; (3) identity of advertising media; (4) strength of the trademark or trade dress; (5) intent of the defendant; (6) similarity of design; (7) actual confusion; and (8) degree of care employed by consumers. *See Blue Bell,* 864 F.2d at 1259-60; *Sno-Wizard,* 791 F.2d at 428. Proof of actual confusion is not a prerequisite, and no single factor is dispositive of the likelihood of confusion. *Taco Cabana,* 932 F.2d at 1122 n.9.

The district court weighed all eight factors and found that there is a substantial likelihood of confusion between the mixers. On appeal, West Bend challenges the weight accorded three factors

20

in this analysis, arguing that they disprove any risk of confusion. The conclusions of the district court are not clearly erroneous.[22]

1.

The district court concluded that West Bend had intentionally copied the product configuration of the American Classic Mixmaster®. The intent of the defendant is a "'critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff,] *that fact alone may be sufficient to justify the inference that there is confusing similarity.*'" *Chevron*, 659 F.2d at 703-04 (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980)).[23]

West Bend objects to this characterization of the evidence, arguing that there is no evidence of intent to derive benefit from the Sunbeam reputation. Direct evidence is unnecessary, however; impermissible intent may be inferred from the fact that a defendant plagiarized the trade dress of a product. *See Chevron*, 659 F.2d at 704.

After considering the evidence, the district court found that

---

[22] West Bend does not dispute that the first four factors in this calculus support the findings: (1) The two products are identical; (2) the products are marketed to the same consumers through the same retailers; (3) the two companies use the same advertising media to market their products; and (4) the American Classic Mixmaster® enjoys a "strong" distinctive trade dress. Even a "weak" trade dress may be protected within its own product line, moreover, thereby warranting injunctive relief in the instant case. *See Taco Cabana*, 932 F.2d at 1120. Finally, although Sunbeam introduced no evidence of actual confusion by consumers, proof of actual confusion is not a prerequisite to injunctive relief. *Id*. at 1122 n.9; *Blue Bell*, 864 F.2d at 1260.

[23] *Accord Taco Cabana*, 932 F.2d at 1122 n.11; *Blue Bell*, 864 F.2d at 1259; *Sno-Wizard*, 791 F.2d at 428.

"there has been no other plausible explanation presented by the Defendant for the virtual replication of the Plaintiff's Mixmaster® mixer," and inferred that West Bend had intended to imitate the American Classic Mixmaster® and thereby benefit from the consumer goodwill associated with Sunbeam mixers. This circumstantial inference is corroborated by direct evidence: West Bend submitted a picture of the American Classic Mixmaster® to its manufacturer in China, directing his attention to "this one."[24] The court was entitled to infer that West Bend intended to copy the American Classic Mixmaster® and usurp consumer goodwill, and this finding of fact is not clearly erroneous.

Granted, the defendant's intent is only one element in the likelihood-of-confusion inquiry, and intent alone is not sufficient to establish trade dress infringement. *See Blue Bell*, 864 F.2d at 1258-59. Nevertheless, it is firmly established that a finding of intent may support an inference of consumer confusion. *Id*. at 1259.

Moreover, the evidence of intent does not stand alone in the instant case, but is corroborated by several other factors. Finally, the proper weighing of the relevant factors is left to the district court. *Id*. The district court was entitled to find that West Bend intentionally copied the design of the American Classic

---

[24] Indeed, in addition to the photograph of the American Classic Mixmaster®, West Bend included a marked-up copy of the product description accompanying the Sunbeam mixer, altering the product specifications and replacing references to Sunbeam with references to West Bend. This plagiarism supports the inference that West Bend used the American Classic Mixmaster® as a template for its mixers.

Mixmaster®, and it reasonably could infer a likelihood of confusion from this unlawful intent.

**2.**

West Bend criticizes the district court for its holistic view of the similarities between the American Classic Mixmaster® and the West Bend mixers, arguing that the court should have considered the "key design features" of the mixers to determine whether there was a likelihood of confusion between the two product configurations. Once again, West Bend ignores the fact that the trade dress of a product is comprised of its "total image" and "overall appearance," not isolated components. *Blue Bell*, 864 F.2d at 1256.

In particular, for purposes of the likelihood of confusion inquiry, the courts must consider the overall trade dress of the product. "[I]t is the 'combination of features as a whole rather than a difference in some of the details which must determine whether the competing product is likely to cause confusion in the mind of the public.'" *Chevron*, 659 F.2d at 704 (citations omitted). Accordingly, the district court did not err in concluding that the similarities in design between the American Classic Mixmaster® and the West Bend mixers created a likelihood of confusion.[25]

---

[25] West Bend reminds us that it introduced expert testimony to establish that the American Classic Mixmaster® and the West Bend mixers employ a different "form language" and thus bear a different appearance. Nevertheless, the district court did not credit this expert testimony, finding that the two products are "as alike as two peas in a pod." This is a fact issue, and the trier of fact is entitled to choose between two equally permissible views of the evidence. This

(continued...)

23

Finally, the likelihood of confusion created by similar trade dresses and product configurations may be alleviated by other source indicia, such as manufacturer's labels. *E.g.*, *Blue Bell*, 864 F.2d at 1260; *Sno-Wizard*, 791 F.2d at 428. Particularly in product configuration litigation, where consumers are less likely to rely on the configuration as a source identifier, labels and packaging may eliminate confusion. *See Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 203 (3rd Cir.), *cert. denied*, 116 S. Ct. 54 (1995). As the Third Circuit explains, "clarity of labeling in packaging and advertising will suffice to preclude almost all possibility of consumer confusion as to source stemming from the product's configuration." *Id.*

It is uncontested that both the West Bend stand mixers and the Sunbeam American Classic Mixmaster® are labeled with the trademarks of their respective manufacturers. Therefore, West Bend contends that any risk of confusion has been eliminated, as the manufacturer's labels and distinctive packaging distinguish the competing products and allay any fears of consumer confusion. This is particularly true, West Bend argues, because stand mixers are not impulse purchases, but are expensive household appliances; consumers ordinarily exercise a higher degree of care in purchasing such items, thereby reducing the likelihood of consumer confusion. Indeed, in the case of a high-priced, single-purchase article,

---

(...continued)
factual determination is not clearly erroneous.

there is hardly a likelihood of confusion when the name of the manufacturer is openly displayed on a product. *E.g.*, *Blue Bell*, 864 F.2d at 1260; *Sno-Wizard*, 791 F.2d at 428-29.

Nevertheless, although this argument has considerable merit and enjoys substantial support in our precedent, it is insufficient to demonstrate that the district court clearly erred in finding a likelihood of confusion under the unique facts of the instant case. While we have recognized that labels may dispel consumer confusion, under appropriate circumstances, we have never held that this is an absolute affirmative defense to every trademark infringement claim. To the contrary, we have also observed that the mere labeling of a product will not automatically alleviate a likelihood of confusion, *Sno-Wizard*, 791 F.2d at 429, and the ultimate determination of consumer confusion is a question of fact for the district court.[26]

### D.

In conclusion, Sunbeam established a substantial likelihood of success on the merits of its trade dress infringement claim. It introduced sufficient evidence to prove secondary meaning,

---

[26] We have never *vacated* a preliminary injunction on the ground that a manufacturer's label alleviated any likelihood of confusion, as a matter of law. In every decision cited to us by West Bend, we *affirmed* preliminary injunctions because the findings of the district courts were not clearly erroneous. *See*, *e.g.*, *Blue Bell*, 864 F.2d at 1260; *Sno-Wizard*, 791 F.2d at 428-29. Obviously, the proposition that a court *may* conclude that a manufacturer's labels alleviate the risk of consumer confusion is not tantamount to the proposition that the court *must* reach such a conclusion, notwithstanding the other factors mandated under the "digits of confusion" test. Such a rule would eviscerate the district court's role as the finder of fact, and we decline to endorse it as a matter of law.

25

particularly given the statutory presumption that the substantially continuous and exclusive use of a particular mark or dress for over five years raises an inference of secondary meaning. Accordingly, the district court correctly found that the product configuration of the American Classic Mixmaster® warrants trade dress protection.

Second, the product configuration of the American Classic Mixmaster® is not functional. Notwithstanding the incorporation of certain functional features, the protected trade dress is the total image and overall appearance of the American Classic Mixmaster®.

Finally, the district court was entitled to find a likelihood of confusion between the American Classic Mixmaster® and the West Bend mixers. While the use of manufacturers' labels might dispel any confusion, the district court is entitled to evaluate conflicting evidence, and its factual determination regarding the likelihood of confusion is not clearly erroneous. Accordingly, the court did not err in concluding that Sunbeam has shown a substantial likelihood of success on the merits of its trade dress infringement claim, warranting a preliminary injunction under the Lanham Act.

### III.

West Bend argues that the preliminary injunction is contrary to the public interest, because trade dress protection for the product configuration of the American Classic Mixmaster® would grant a "permanent patent" on the key design features of the mixer. This alarmist rhetoric is unfounded.

26

As we have stated, trade dress protection of the "total image" and "overall appearance" of the American Classic Mixmaster® is not tantamount to protection of the isolated functional components, which remain in the public domain absent protection by patent law. Therefore, trade dress protection of the American Classic Mixmaster® protects the whole, which is greater than the sum of its parts.  Sunbeam "does not seek protection for individual elements, but for a particular combination of elements which constitute trade dress as a whole."  *Taco Cabana*, 932 F.2d at 1119.

The Lanham Act embodies two strong countervailing policies: protection of the proprietary interest in distinctive trademarks, minimizing consumer confusion and maximizing consumer confidence, versus fostering competition and its attendant economic benefits. Trademark law accommodates these countervailing public policies by limiting trademark protection to distinctive, non-functional marks.

In the instant case, therefore, the public interest calculus is subsumed within the merits of the trade dress infringement claim:  Because the product configuration of the American Classic Mixmaster® is entitled to trade dress protection, it necessarily follows that the preliminary injunction serves the public interest. Indeed, trade dress protection of the American Classic Mixmaster® will not frustrate competition, but will foster it.

IV.

West Bend attempted to comply with the preliminary injunction by proposing a series of modifications to its original stand mixer.

27

With only two exceptions, the district court rejected these mixers, modifying the preliminary injunction to include the new designs. We need not consider each subsequent design modification in detail, as the district court possesses broad discretion to vindicate the preliminary injunction by prohibiting subsequent modifications that do not move a "safe distance" away from the trademark infringement. "In such a case as this, where the appellants have been found guilty of infringing the trade-mark rights of others, they should thereafter be required to keep a safe distance away from the dividing line between violation of, and compliance with, the injunction." *Eskay Drugs, Inc. v. Smith, Kline & French Labs.*, 188 F.2d 430, 432 (5th Cir. 1951).[27]

The "safe distance" rule vests broad discretion in the district court, to ensure that the Lanham Act is not frustrated by manufacturers who seek to circumvent injunctions with subsequent modifications. Accordingly, the "safe distance" rule permits the court to issue injunctions that sweep even more broadly than the Lanham Act would permit against a manufacturer who has not already been found liable for trademark infringement. "'[A] competitive business, once convicted of unfair competition in a given particular, should thereafter be required to keep a safe distance away from the margin line§§even if that requirement involves a handicap as compared with those who have not disqualified themselves.'" *Chevron*, 659 F.2d at 705 (quoting *Broderick & Bascom*

---

[27] *See also* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30.13[1] (4th ed. 1997).

*Rope Co. v. Manoff*, 41 F.2d 353, 354 (6th Cir. 1930)).[28]  Having crossed the line of fair competition, a manufacturer may be ordered to stand back from it.

## V.

In summary, the district court did not abuse its discretion by issuing the preliminary injunction.  The order granting the injunction, accordingly, is AFFIRMED.[29]

---

[28] *Accord Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 154 (5th Cir. 1985) ("When fashioning an injunction in a suit such as this, the court must give careful consideration to the possibility that a defendant found to have either infringed the plaintiff's mark or unfairly competed with the plaintiff will modify his behavior ever so slightly and attempt to skirt the line of permissible conduct.  Courts have responded to this problem by issuing broad injunctions that prohibit conduct that clearly infringes the plaintiff's mark as well as conduct that ordinarily would not justify any relief.").

[29] Given our conclusion that the preliminary injunction was justified under the Lanham Act, we need not consider whether it likewise was warranted under the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c).