COURT OF APPEALS

                                       SECOND DISTRICT OF TEXAS

                                                   FORT WORTH

 

 

                                        NO. 2-08-144-CV

 

 

ASTORIA INDUSTRIES OF IOWA, INC.                                    APPELLANT

 

                                                   V.

 

BRAND FX BODY COMPANY                                                    APPELLEE

 

                                              ------------

 

            FROM THE 17TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








In six issues, appellant Astoria Industries of
Iowa, Inc. (Astoria) complains of the trial court=s judgment awarding appellee Brand FX Body
Company (Brand FX) damages in the amount of $705,000 for trade dress
infringement and common law misappropriation, $682,200 for false advertising,
and $400,000 in attorney=s
fees on appellee=s
trade dress infringement and false advertising claims, in addition to $150,000
for attorney=s
fees on appeal.  We affirm the judgment
as modified.

I.    
BACKGROUND AND JURISDICTIONAL FACTS

Astoria and Brand FX are business
competitors.  They manufacture and sell
fiberglass utility bodies and work toppers[2]
for commercial vehicles.  Brand FX=s work topper uses a stair‑step roof line
that it claims is unique and brand‑distinguishing.  Initially, Astoria=s topper had a rounded or domed roof line.  In late 2002, however, Astoria developed a
topper with a stair‑step roof design virtually identical to Brand FX=s topper. 








Astoria engineer Randy Thole acknowledged that
Astoria  developed its  stair‑step topper to be as similar to
Brand FX=s design as possible.  Astoria obtained from one of its customers,
Cook=s Pest Control (Cook=s), the engineering drawings of Brand FX=s predecessor, Fibre Body, and used a Fibre Body
topper from Cook=s
as a Aplug@[3] to make a mold to manufacture its look-alike
topper.  Astoria then sold its stair-step
toppers to Cook=s
for approximately one-half of the price charged by Brand FX. 

Thereafter, in February 2003, Astoria began
running a ADARE
TO COMPARE@
advertisement for its utility bodies in an industry trade journal.  The advertisement ran ten times over the
course of fourteen months.  The
advertisement begins by stating, AWhen choosing fiberglass utility bodies, Astoria
Industries of Iowa should be your supplier!@  The
advertisement compares AHigh
Quality Astoria Bodies vs. Low Quality Brand X Bodies.@ Regarding the latter, the advertisement
states:  (1) A[B]uilt with sub‑standard materials@; (2) AShort term cost with long term expenses@; (3) ABuilt to their standard@; and (4) A1‑year warranty.@ 

In late May 2003, Brand FX notified Astoria of
Brand FX=s belief that the 
ADARE TO COMPARE@ advertisement was false and disparaging and
asked Astoria to stop running it.  Brand
FX contended that Astoria=s
reference to ABrand
X Bodies@ was a poorly‑disguised reference to Brand
FX and that the advertisement=s first three statements about Brand FX are
demonstrably false. Astoria continued to run the advertisement for another
eleven months. 








As a result of Astoria=s conduct, Brand FX sued Astoria under the Lanham
Act[4]
for infringement of its trade dress topper design and false advertising of
utility bodies.  Brand FX also brought
claims of business disparagement, defamation per se, common law and trade
secret misappropriation, and tortious interference with prospective
relations.  Astoria obtained summary
judgment dismissing Brand FX=s business disparagement claim,[5]
and the remaining claims were presented to the jury.








The jury found Astoria liable for trade dress
infringement and common law misappropriation and determined that Astoria gained
$705,000 in profits on sales of its toppers as a result.  The jury also found that Astoria committed
false advertising of its utility bodies and that Brand FX=s corrective advertising damages totaled $52,200,
but they determined that the false advertising resulted in no profits for
Astoria.  Brand FX moved for judgment
notwithstanding the verdict (JNOV) on the jury=s finding that Astoria gained no profits from its
false advertising and asked for an award of $4,200,000 in profits on the false
advertising claim.  The trial court
granted Brand FX=s
motion in part, awarding it $630,000 in Astoria=s profits for false advertising, in addition to
the award on the jury verdict of $705,000 in profits on the trade dress
infringement claim.  The judgment also
awarded Brand FX $400,000 in attorney=s fees on the trade dress and false advertising
claims and $150,000 in additional attorney=s fees on appeal. 
This appeal followed.

II.    
ISSUES








In its first two issues, Astoria contends that
the evidence is not legally and factually sufficient to support two necessary
elements of Brand FX=s
trade dress claim:  that the stair-step
topper design at issue is not functional and that the design has acquired a
secondary meaning.[6]  Third, Astoria contends that Brand FX=s state law design misappropriation claim is
preempted by federal patent law.  Fourth,
Astoria challenges the legal and factual sufficiency of evidence supporting the
award of its profits on Brand FX=s false advertising claim.  Fifth, Astoria contends that the trial court
erroneously admitted hearsay testimony without qualification and that this
testimony is the only evidence supporting the award of corrective advertising
costs on the false advertising claim. 
Sixth, Astoria complains that the award of attorney=s fees is not authorized and, alternatively, that
the appellate attorney=s
fee award is not properly conditioned on a successful appeal.








III.    
SUFFICIENCY OF THE EVIDENCE SUPPORTING BRAND FX=S 

TRADE DRESS INFRINGEMENT CLAIM

A.     Standard
of Review

We may sustain a legal sufficiency challenge only
when (1) the record discloses a complete absence of evidence of a vital fact,
(2) the court is barred by rules of law or of evidence from giving weight to
the only evidence offered to prove a vital fact, (3) the evidence offered to
prove a vital fact is no more than a mere scintilla, or (4) the evidence
establishes conclusively the opposite of a vital fact.[7]  In determining whether there is legally sufficient
evidence to support the finding under review, we must consider evidence
favorable to the finding if a reasonable factfinder could and disregard
evidence contrary to the finding unless a reasonable factfinder could not.[8]








Anything more than a scintilla of evidence is
legally sufficient to support the finding.[9]  When the evidence offered to prove a vital
fact is so weak as to do no more than create a mere surmise or suspicion of its
existence, the evidence is no more than a scintilla and, in legal effect, is no
evidence.[10]  More than a scintilla of evidence exists if
the evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of a vital fact.[11]

When reviewing an assertion that the evidence is
factually insufficient to support a finding, we set aside the finding only if,
after considering and weighing all of the evidence in the record pertinent to
that finding, we determine that the evidence supporting the finding is so weak,
or so contrary to the overwhelming weight of all the evidence, that the answer
should be set aside and a new trial ordered.[12]

B.     Trade Dress InfringementCFunctionality








To prevail on a claim of trade dress infringement
under the Lanham Act, a plaintiff must prove three elements: (1) the packaging
or design is not primarily functional, (2) it has acquired a Asecondary meaning@ by which the public identifies it with the
source of the product rather than merely the product itself, and (3) the
alleged infringement creates a likelihood of confusion.[13]  The burden of proof is on the person who
asserts trade dress protection.[14]  All three elements are questions of fact for
the jury.[15]

Generally, a product is functional if it (1) is
essential to the use or purpose of the article, or (2) affects the cost or
quality of the article.[16]  If the asserted trade dress is not functional
under this initial test, courts may also consider the Acompetitive necessity@ test of whether the exclusive use of the feature
or design Awould
put competitors at a significant non-reputation-related disadvantage.@[17]








The jury in this case found that the asserted
trade dress, Brand FX=s
stair-step topper design, is Aprimarily non-functional.@  Astoria
contends that the evidence is not legally sufficient to support this finding.

To establish that the stair-step design is
primarily nonfunctional, Brand FX offered the testimony of its owner and
operator, Alfred Finley.  Finley has been
in the industry since 1969.  He formed
and ran Fibre Body from 1984 until 1999. 
He started Brand FX in 2001 and has run the company ever since. Finley
testified that the stair-step topper design is not essential to the use or
purpose of the work topper and does not affect the work topper=s cost or quality.  Finley also testified that his competitors
primarily sold dome-shaped toppers, and that the dome shape is not functional
or essential to the use of the work topper. 

The jury also heard testimony regarding the
stair-step design=s
lack of functionality from Sam Alfano, the Cook=s employee in charge of purchasing its work
toppers and overseeing its truck fleet. 
Alfano purchased approximately ninety to one hundred toppers per year on
behalf of Cook=s.  He testified that, to his knowledge, the
stair-step design is not essential to the use or purpose of the work topper,
nor does it affect the topper=s cost or quality.  Cook=s purchased stair-step toppers from Astoria for
the same price as Astoria=s
dome-shaped toppers.








Testimony from three Astoria witnessesCRobert Wolf, Randy Thole, and Jack BrannanCalso relates to the stair-step design=s lack of functionality.  Wolf, Astoria=s president and owner, testified that the
stair-step design is not essential to a topper, that he preferred the
dome-shaped roof design, and that the stair-step design was not good for
manufacturing.  Wolf stated that the
stair-step design was only Aessential@ to Cook=s in order to match its existing fleet:

       Q:     Is [the stair-step topper design] essential
or not essential?

. . . . 

A:     It is essential for what Mr. Cook=s designed [sic] is.

Q:     . . . You didn=t tell me that in your deposition. 
You said it wasn=t essential.

A:     It=s not if you allow me to design the topper.  I don=t need the stair step.  But if you=re going to
use that design, it=s very essential. [Emphasis added.] 

Thole, Astoria=s engineer who developed its version of the
stair-step topper, also testified that the stair-step design is not essential
to the use or purpose of a work topper. 
Brannan, Astoria=s
former chief engineer, likewise testified that the stair-step design is not
essential to strengthen the roof of a topper because the dome shape gives the
roof enough strength for the topper=s intended use. 








Based on our consideration of evidence favorable
to the challenged finding if a reasonable factfinder could, and disregarding
evidence contrary to the finding unless a reasonable factfinder could not, we
hold that there is legally sufficient evidence to support the finding that
Brand FX=s stair-step topper design is primarily
nonfunctional.

Astoria also contends that the evidence is
factually insufficient to support the finding of nonfunctionality.  As evidence contrary to the finding, Astoria
cites the testimony of Finley, Brannan, and Wolf that the molded shape of the
design increases the strength of the topper=s roof without added materials, or increases the
topper=s Asectional modulus.@[18]  Finley
testified on Asectional
modulus@ as follows:

       Q:     Tell us what
[sectional modulus] is.

 

A:     Basically, the higher the sectional
modulus, the higher the stiffness . . . of the laminate.

Q:     It gives you a stronger design without
having to use additional materials; isn=t that
correct?

A:     Correct.

Q:     All right. 
Functionality; isn=t that correct?








A:     I have been told that the definition of
functional is essential, and that the top can be built without the stair-step
design and still be functional.  Does it
serve a function?  Yes.

Brannan also testified about the functionality of
Brand FX=s stair-step design:

Q:     [Y]ou don=t necessarily need the stair-step design to have the proper strength
for the intended use of that, true?

A:     If you wanted to minimize the cost and
eliminate the need for additional materials, then a stair-step design is really
the way to go.

. . . .

Q:     Your opinion is that the stair step design
is functional in that it increases the strength of the topper, true?

A:     That=s correct.

The jury also heard evidence from Wolf that the
stair-step design allows the topper to carry heavier loads on its roof without
added material costs. Photographs and drawings were introduced showing the
placement of a load-carrying rack on the roof of the topper. 








However, the jury also heard evidence showing
that it is not essential for a topper to have added roof strength or the
ability to carry heavier loads on the roof: 
Brand FX=s
advertisements did not promote the topper=s added strength due to the stair-step design,[19]
and some introduced photographs of the topper showing no roof rack and no load
on the top.  Additionally, Brannan
testified that he was asked to look at ways to strengthen the roof design of
another of Astoria=s
products, a flat-topped full utility body cover, and that he did not even
consider using a stair-step design to strengthen the roof of that product.








Astoria also challenges evidence of
nonfunctionality presented by Brand FX. 
Astoria contends that Finley provides the sole testimony supporting
nonfunctionality and that his testimony is conclusory.[20]  However, testimony from Alfano, Thole,
Brannan, and Wolf also provides evidence of nonfunctionality.  And Finley=s testimony was supported by his years of
experience as a fiberglass manufacturer and designer and was based on his
specific knowledge of the stair-step design and its manufacture beginning in
1996 when he bought the company that had owned the design, Northwest Body, and
decided to incorporate it into the product line of his own company, Fibre Body.

Astoria also argues that Alfano=s testimony of nonfunctionality is conclusory and
is not probative because he was a fact witness and an accountant by
training.  However, Alfano testified
based on his first-hand experience as the person who purchases and manages Cook=s fleet of toppers and utility bodies, including
toppers with stair-step and dome-shaped roofs. Alfano=s experience thus involved the use, purpose,
cost, and quality of toppers purchased and used by Cook=s, all factors relating to the stair-step roof
design=s functionality.[21]

Considering and weighing all of the evidence in
the record pertinent to the finding of nonfunctionality, we determine that the
evidence supporting the finding is not so weak, or so contrary to the
overwhelming weight of all the evidence, that the answer should be set aside
and a new trial ordered.[22]
Accordingly, we hold that there is factually sufficient evidence to support the
jury=s finding that Brand FX=s stair-step topper design is primarily
nonfunctional. We overrule Astoria=s first issue.








C.     Trade
Dress InfringementCSecondary
Meaning

To prevail on its trade dress infringement claim,
Brand FX also bore the burden at trial of proving that the topper=s stair-step design has acquired a secondary
meaning.[23]  Trade dress acquires secondary meaning when, Ain the minds of the public, the primary
significance of [the design] is to identify the source of the product rather
than the product itself.@[24]  The
existence of secondary meaning is a question for the trier of fact, and a trier
of fact=s finding on this issue will not be disturbed
unless clearly erroneous.[25]








Secondary meaning may be established through a
combination of the following nonexhaustive list of evidentiary factors:  (1) length and manner of use of the trade
dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of
use of the trade dress in newspapers and magazines, (5) consumer‑survey
evidence, (6) direct consumer testimony, and (7) the defendant=s intent in copying the trade dress.[26]  The ultimate determination of whether trade
dress has acquired secondary meaning remains a question of consumer
association.[27]

The jury found that the stair-step topper roof
design had acquired secondary meaning. 
Astoria contends that the evidence is not legally sufficient to support
this finding.








In support of secondary meaning, Brand FX
introduced evidence regarding  length and
manner of its use of the stair-step topper design.  Brand FX and its predecessors Northwest Body
and Fibre Body have continuously used the design since at least the mid-1990s,
and had done so exclusively until Astoria copied the design in late 2002.  As further support of secondary meaning,
Brand FX also introduced evidence of Astoria=s intent in copying the design;  Thole and Wolf testified that Astoria
intentionally copied Brand FX=s stair-step design with the intent of having
Astoria=s design be as close as possible to Brand FX=s design. 
Additionally, Brand FX presented direct testimony from two customersCone end user and one distributorCsupporting a finding of secondary meaning because
they uniquely identified or associated the stair-step roof design with Brand
FX.  The customers also testified to
actual confusion by Astoria=s use of the trade dress by incorrectly
identifying a picture of Astoria=s topper as Brand FX=s based on its stair-step roof design.  Accordingly, Brand FX introduced evidence
supporting three of the factors relevant to consumer association indicative of
secondary meaning.[28]

Based on our consideration of evidence favorable
to the challenged finding if a reasonable factfinder could, and disregarding
evidence contrary to the finding unless a reasonable factfinder could not, we
hold that there is legally sufficient evidence to support the finding that
Brand FX=s stair-step topper design has acquired secondary
meaning.








Astoria contends that the evidence is factually
insufficient to support the finding of secondary meaning because there is
purportedly no evidence regarding other factors that traditionally indicate
secondary meaning has been acquired.  For
instance, consumer-survey evidence of identification of the trade dress with
its source is the most direct and persuasive evidence to establish secondary
meaning.[29]  Here, Brand FX performed no consumer surveys.
Moreover, there is no evidence of two other factors traditionally indicative of
secondary meaning:  media coverage and
advertising expenditures by Brand FX promoting its stair-step design.[30]

With regard to length and exclusivity of use,
Astoria contends that the evidence offered by Brand FX actually contradicts a
finding of secondary meaning because Brand FX did not begin selling its
stair-step toppers until 2002.  However,
evidence of a predecessor=s
use may establish the length and exclusivity of a plaintiff=s use.[31]  Brand FX introduced evidence that Northwest
Body developed the stair-step topper design before it was acquired by Fibre
Body Industries in approximately 1996, and Brand FX subsequently acquired Fibre
Body=s intellectual property rights in 2002.  The evidence shows that only Brand FX and the
prior owners of the design used it, to the exclusion of all others,  from at least 1996 until Astoria developed
its look-alike topper in 2002. Thus, the length and exclusivity of use by Brand
FX and the prior owners of the design support a finding of secondary meaning.








Regarding direct customer testimony, Astoria
contends that the testimony introduced by Brand FX was insufficient because it
came from only two witnessesCone distributor and one end userCand their past association with Brand FX makes
their testimony of little weight. 
However, cases Astoria cites in support of these contentions are
distinguishable.  For example, Astoria
relies on a case in which the direct testimony of seven witnesses was
outweighed by evidence of a consumer survey establishing a lack of customer
identification,[32]
but Astoria introduced at trial no evidence establishing a lack of customer
identification.  Astoria also cites a
case in which six customers= testimony of confusion was insufficient in
comparison to the number of potential customers, consisting of all buyers of
telephone and network installation services in the Southern California area.[33]  Here, the number of customers who testified,
two, must be weighed against the number of potential customers, which in this
case are businesses that purchase utility bodies and work toppers.[34]








Astoria also contends that its intent in copying
the design does not support secondary meaning because it did not intend to fool
Cook=s as to the topper=s source. 
Astoria argues that it was merely responding to Cook=s own request that Astoria offer a look-alike
topper.  However, Astoria concedes that
it developed its stair‑step topper with the intent that it look as
similar to Brand FX=s
design as possible.  Thus, Astoria
intended to confuse those looking at its topper into assuming that it had the
same source as the Brand FX toppers in Cook=s existing fleet.

Considering and weighing all of the evidence in
the record pertinent to the finding of secondary meaning, we determine that the
evidence supporting the finding is not so weak, or so contrary to the
overwhelming weight of all the  evidence,
that the answer should be set aside and a new trial ordered.[35]
Accordingly, we hold that there is factually sufficient evidence to support the
jury=s finding that Brand FX=s stair-step topper design has acquired secondary
meaning.  We overrule Astoria=s second issue.








IV.    
FEDERAL PATENT LAW DOES NOT PREEMPT BRAND FX=S

MISAPPROPRIATION CLAIM

In its third issue, Astoria contends that Brand
FX=s common law design misappropriation claim
conflicts with, and is thus preempted by, federal patent law. 








A common law misappropriation claim alleges a
form of unfair competition under Texas law.[36]  AThe law of unfair competition is the umbrella for
all statutory and nonstatutory causes of action arising out of business conduct
which is contrary to honest practice in industrial or commercial matters.@[37]  To
prevail on a claim of common law misappropriation, the plaintiff has the burden
of establishing:  (1) the creation of its
product through extensive time, labor, skill and money, (2) the defendant=s use of that product in competition with the
plaintiff, thereby gaining a special advantage in that competition (i.e., a Afree ride@) because the defendant is burdened with little
or none of the expense incurred by the plaintiff, and (3) commercial damage to
the plaintiff.[38]  Here, Brand FX claims that Astoria
misappropriated the stair-step roof design of its toppers.  

There is a presumption against federal preemption
of state actions.[39]
However, state laws are preempted if they conflict with valid federal law by
creating an Aobstacle
to the accomplishment and execution of the full purposes and objectives of
Congress.@[40]  Astoria
asserts that Brand FX=s
misappropriation claim conflicts with Astoria=s right, created under federal patent law, to
copy and use product features that are in the public domain.[41]








The Supreme Court has held that state regulation
of intellectual property Amust
yield to the extent that it clashes with@ federal patent law.[42]  The Court determined that Athe efficient operation of the federal patent
system depends upon substantially free trade in publicly known, unpatented
design and utilitarian conceptions.@[43]  In the
same opinion, the Court held that state unfair competition laws, in contrast,
generally serve a different purpose by providing Aprotection against copying of nonfunctional aspects
of consumer products.@[44]  Thus, the
Court determined that state unfair competition laws typically are not preempted[45]
unless they conflict with federal patent law by protecting or regulating the Afunctional
aspects@ of a product.[46]








Turning to the facts of our case, we already have
held that the record contains legally and factually sufficient evidence
supporting the jury=s
finding that Brand FX=s
stair-step topper design is not functional.[47]  This holding is fatal to Astoria=s preemption argument, because federal patent law
does not preempt state unfair competition laws that protect against the copying
of product=s
nonfunctional aspects.[48]  Accordingly, we overrule Astoria=s third issue.

V.    
AWARD OF PROFITS ON BRAND FX=S FALSE ADVERTISING CLAIM

In its fourth issue, Astoria contends that the
evidence is not legally or factually sufficient to support an award of Astoria=s utility body profits on Brand FX=s false advertising claim and that the award
amounts to an impermissible penalty.[49]  The jury found that Astoria=s profits on its sale of utility bodies during
the relevant time period was zero.  Brand
FX filed a motion for JNOV contending that no evidence supported the jury=s zero profits finding and requesting an award of
Astoria=s utility bodies profits.  After an evidentiary hearing, the trial court
granted Brand FX=s
JNOV motion and awarded it $630,000 as the amount of Astoria=s profits related to sales of its advertised
utility bodies during the period of time the ADARE TO COMPARE@ advertisement ran.[50]








A.     JNOV Standard of Review

A trial court may disregard a jury verdict and
render a JNOV if no evidence supports the jury finding on an issue necessary to
liability or if a directed verdict would have been proper.[51]  A directed verdict is proper only under
limited circumstances: (1) when the evidence conclusively establishes the right
of the movant to judgment or negates the right of the opponent; or (2) when the
evidence is insufficient to raise a material fact issue.[52]

To determine whether the trial court erred by
rendering a JNOV, we view the evidence in the light most favorable to the
verdict under the well-settled standards that govern legal sufficiency review.[53]  We must credit evidence favoring the jury
verdict if reasonable jurors could and disregard contrary evidence unless
reasonable jurors could not.[54]

 








B.     False Advertising Under the Lanham Act and
Available Remedies

To establish a prima facie case of liability for
false advertising under the Lanham Act, the plaintiff must show that (1) the
defendant made a false statement of fact about its product in a commercial
advertisement, (2) the statement actually deceived or has a tendency to deceive
a substantial segment of its audience, (3) the deception is likely to influence
a purchasing decision, (4) the defendant caused the false statement to enter
interstate commerce, and (5) the plaintiff has been or is likely to be injured
as a result.[55]

Remedies available to a plaintiff on a Lanham Act
false advertising claim include the defendant=s profits on the falsely advertised product:

[T]he plaintiff shall be entitled . . . subject
to the principles of equity, to recover . . . defendant=s profits . . . . 
The court shall assess such profits and damages or cause the same to be
assessed under its direction.  In
assessing profits the plaintiff shall be required to prove defendant=s sales only; defendant must prove all elements of cost or deduction
claimed. . . .  If
the court shall find that the amount of the recovery based on profits is either
inadequate or excessive the court may in its discretion enter judgment for
such sum as the court shall find to be just, according to the circumstances of
the case.  Such sum in either of the
above circumstances shall constitute compensation and not a penalty.[56]








These
remedies are designed to compensate the plaintiff for any injury suffered,
prevent unjust enrichment, or deter unlawful conduct.[57]  In determining whether an award of the defendant=s profits is appropriate, a trial court is
afforded Agreat
latitude@ and Awide discretion,@[58] and we review the trial court=s decision for an abuse of discretion.[59]

Evidentiary factors relevant to the determination
of whether an award of profits is appropriate on a Lanham Act false advertising
claim include but are not limited to:

(1) whether the defendant had the intent to
confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of
other remedies, (4) any unreasonable delay by the plaintiff in asserting his
rights, (5) the public interest in making the misconduct unprofitable, and (6)
whether it is a case of palming off.[60]








No
one factor is fatal or controlling.[61]  In any event, an award of profits is not
appropriate Aunless
there is some proof that plaintiff lost sales or profits, or that defendant
gained them.@[62]

As the Lanham Act provides, A[i]n assessing profits the plaintiff shall be
required to prove defendant=s sales only; defendant must prove all elements
of cost or deduction claimed@ against its gross sales.[63]  The Supreme Court acknowledged that this
method of calculating profits may result in the plaintiff receiving a windfall
in cases Awhere
it is impossible to isolate the profits@ from conduct that violates the Lanham Act, but
the Court determined that Athe windfall should go to the plaintiff rather
than the wrongdoer.@[64]  And ACongress did not put upon the despoiled the
burden . . . of showing that but for the defendant=s unlawful [activity], particular
customers would have purchased the plaintiff=s goods.@[65] 








C.     JNOV
Awarding Astoria=s
Utility Body Profits to Brand FX

Brand FX presented evidence that utility body
sales were diverted by Astoria=s false advertising.[66]  Specifically, Finley testified for Brand FX
that its utility body sales decreased 21% during Astoria=s advertising campaign and increased 54%
thereafter.  This type of statistical
evidence is sufficient to show sales diversion under ' 1117 because the statute does not require the
plaintiff to show that, Abut
for the defendant=s
unlawful [activity], particular customers would have purchased the
plaintiff=s
goods.@[67]  In
addition, Scott Metzger, Astoria=s head of sales and marketing, testified that
potential customers sought additional information from Astoria in response to
its advertising.  Of those potential
customers, Astoria and Brand FX competed for sales to Altec and Omaha Public
Power District; Altec is now one of Astoria=s largest customers; and Astoria replaced Brand
FX as the supplier for Omaha Public Power District.[68]









Regarding Astoria=s intent to confuse or deceive, Wolf, Thole, and
Metzger each testified that they knew the advertisement contained false
statements with respect to Brand FX. 
Astoria still continued to run the false advertisement for approximately
eleven months after Brand FX=s attorney sent it a cease and desist letter.








Whether or not other remedies are adequate is
also a factor courts consider when determining whether an award of profits is
appropriate.[69]  In cases of willful misconduct in which the
defendant is unjustly enriched, other remedies, such as injunctive relief, have
been found inadequate because they will not deter future misconduct.[70]  Here, the jury was not asked to find whether
Astoria=s false advertising was willful,[71]
but evidence of Astoria=s
willful misconduct in the record includes testimony that Astoria knew the
advertisement was false as to Brand FX and still chose to continue running it
even after receiving Brand FX=s cease and desist letter.  Based on the willfulness of Astoria=s violation, other remedies are not appropriate
to compensate Brand FX and to deter future misconduct.[72]  In addition, an award of profits serves the
public interest in this case by ensuring that willful false advertising
violations are not profitable.[73]

The trial court implicitly determined that an
equitable award of Astoria=s profits was appropriate and determined the
amount of the award based on the framework established in 15 U.S.C.A. ' 1117(a), which requires the plaintiff Ato prove defendant=s sales only; defendant must prove all elements
of cost or deduction claimed@ against sales.[74]  Brand FX=s damages expert, Daniel Jackson, testified
without objection that Astoria had $4.2 million in sales revenue on its utility
bodies during the period it committed false advertising. Jackson based his
testimony on historical sales figures produced by Astoria during the lawsuit. 








Although ' 1117 provides that the defendant must prove
all elements of cost or deduction claimed from its sales revenue,[75]
Astoria did not present any evidence of its costs or deductions.  In addition, the manner in which Astoria
produced its financial figures did not allow for a determination of its profit
margin on the product.  The most
analogous information presented to the jury regarding profit margin was Brand
FX=s 38.5% profit margin on the sales of its
toppers.  








Based on the evidence, the trial court determined
that Astoria obtained $4.2 million in utility body sales revenue during the
period it falsely advertised and that Astoria=s profit margin was fifteen percent.  Accordingly, the court awarded Brand FX
$630,000 in Astoria=s
profits on the false advertising claim. Implicit in the court=s award is its determination that the amount
awarded constitutes compensation for Brand FX and not a penalty.[76]  Viewing the evidence in the light most
favorable to the jury=s
finding that Astoria had zero utility body profits during the relevant time
period,[77]
we hold that the trial court=s JNOV awarding Brand FX $630,000 in Astoria=s utility body profits is proper because the
evidence is insufficient to raise a material fact issue regarding the costs or
deductions to be applied against Astoria=s sales.[78]  We overrule Astoria=s fourth issue.

VI.    
ADMISSION OF HEARSAY EVIDENCE OF BRAND FX=S

CORRECTIVE
ADVERTISING COSTS

In its fifth issue, Astoria argues that the trial
court erred by admitting Jackson=s expert testimony regarding Brand FX=s corrective advertising costs because his
testimony contained, and was merely a conduit for, hearsay evidence Jackson
obtained from advertising executive Tom Prikryl.  Astoria contends that this portion of Jackson=s testimony was, therefore, inadmissible and, in
the alternative, should only have been admitted with a proper limiting
instruction under Texas Rule of Evidence 705.[79]









A.     Standard
of Review

A trial court=s rulings in admitting evidence are reviewable
under an abuse of discretion standard.[80]  An appellate court must uphold the trial
court=s evidentiary ruling if there is any legitimate
basis in the record for the ruling.[81]
To determine whether a trial court abused its discretion, we must decide whether
the trial court acted without reference to any guiding rules or principles; in
other words, we must decide whether the act was arbitrary or unreasonable.[82]  An appellate court cannot conclude that a
trial court abused its discretion merely because the appellate court would have
ruled differently in the same circumstances.[83]













To obtain reversal of a judgment based upon an
error in the trial court, the appellant must show that the error occurred and
that it probably caused rendition of an improper judgment or probably prevented
the appellant from properly presenting the case to this court.[84]  The complaining party must usually show that
the whole case turned on the evidence at issue.[85]  If erroneously admitted evidence was crucial
to a key issue, the error was likely harmful.[86]
We examine the entire record in making this determination of harm.[87]  Error in admitting evidence is generally harmless
if the objecting party Aopen[s]
the door@ by introducing the same or similar evidence,[88]
the objecting party later permits the same or similar evidence to be introduced
without objection,[89]
or the contested evidence is merely cumulative of properly admitted evidence
and is not controlling on a material issue dispositive of the case.[90]

B.     Error
Admitting the Contested Hearsay Evidence, if Any, is Harmless 








Outside the presence of the jury and before
Jackson testified at trial, Astoria objected to the admission of Aany evidence obtained from Tom Prikryl@ as being Athird-party hearsay@ and to Brand FX using Jackson as a Aconduit for hearsay.@ 
Alternatively, Astoria sought a limiting instruction under rule 705 of
the Texas Rules of Evidence that the jury Abe instructed not to accept the information
obtained from [Prikryl] for the truth of the matter asserted.@[91]  The court
overruled the objections and denied Astoria=s motion for a limiting instruction.  Astoria did not object at trial and does not
argue on appeal that Jackson cannot rely on facts not otherwise admissible in
evidence, including hearsay evidenced from an advertising executive regarding
corrective advertising costs.[92]

Jackson testified that his opinion regarding
Brand FX=s corrective advertising costs was based on
information provided to him by Prikryl:

Q:     Did you summarize your damages as it
relates to this ADare to Compare@ advertisement?

A:     Yes, I did.

Q:     And what are the summary damages that you
calculated?

A:     . . . If you look at the corrective
advertising based upon Mr. Prykel=s [sic]
information and what he believed would be necessary to accomplish it, it=s $76,200.








Jackson
also testified that it was Areasonable and customary@ in his profession as a certified public
accountant to rely on an advertising expert to determine the proper cost of
corrective advertising.

Whether or not the trial court erred in admitting
Jackson=s testimony about information provided by
Prikryl, such testimony is cumulative of other testimony that was admitted
without objection.  Separately and
without reference to Prikryl, Astoria=s counsel solicited the following testimony from
Jackson:

Q:     [Y]ou=re the one telling [the jury] to award $76,000 for future corrective advertising
on something that hadn=t run since four years ago and had no impact on the two people who
came here [to testify]?

A:     If they determine Astoria did falsely advertise.  If they determine [Astoria] didn=t falsely advertise, I=d say don=t award [Brand FX] a penny. 
[Emphasis added.]








This
testimony establishes Jackson=s opinion regarding Brand FX=s corrective advertising costs, does not
reference information provided by Prikryl, and was admitted without
objection.  Any error by the trial court
in admitting the contested testimony is harmless because Astoria later
permitted similar evidence to be introduced without objection during its
cross-examination of Jackson and the contested evidence is merely cumulative of
properly admitted evidence on Jackson=s opinion regarding Brand FX=s corrective advertising costs.[93]  Accordingly, we hold that the trial court=s error in admitting the contested heresay
testimony, if any, did not probably cause the rendition of an improper
judgment.[94]  We overrule Astoria=s fifth issue.

VII.     ATTORNEY=S FEES

In its sixth and final issue, Astoria contends
that the trial court erred by awarding attorney=s fees on Brand FX=s trade dress infringement and false advertising
claims because this is not an Aexceptional case@ in which an award of fees is authorized by the
Lanham Act and, alternatively, because appellate fees were not properly
conditioned on a successful appeal.








The Lanham Act provides that Athe court in exceptional cases may award
reasonable attorney fees to the prevailing party.@[95]  The
prevailing party has the burden to demonstrate the exceptional nature of the
case by clear and convincing evidence.[96]  Clear and convincing evidence is that measure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.[97]

Exceptional cases include when the defendant=s violation of the Lanham Act is malicious,
fraudulent, deliberate, or willful.[98]  The trial court should decide whether a case
is exceptional Aby
examining all the facts and circumstances.@[99]  AThe determination as to whether a case is
exceptional is left to the sound discretion of the trial court.@[100]  We review
a decision to award attorney=s fees for an abuse of discretion and the trial
court=s finding as to whether the case is exceptional
for clear error.[101]








Regarding Astoria=s trade dress infringement, the evidence
establishes that Astoria knew that Brand FX owned the rights to the unique
stair-step design and that Cook=s warned Astoria not to violate Brand FX=s rights. 
Astoria proceeded to copy Brand FX=s design anyway, using Brand FX=s drawings and one of its toppers as a Aplug@ to produce a stair-step topper mold.  Thole, the Astoria engineer in charge of the
project, stated at the time that he knew that Astoria=s actions were Aimproper@ and Awrongful.@ 

Regarding Astoria=s false advertising, three Astoria witnesses
conceded that the ADARE
TO COMPARE@
advertisement contained statements that were false with respect to Brand
FX.  Astoria nonetheless ran the
advertisement, and continued to run it for eleven months after receiving Brand
FX=s cease and desist letter.

Based on the record in this case, we hold that
the trial court could find by clear and convincing evidence that Astoria
deliberately and willfully committed trade dress infringement and false
advertising.  The trial court=s finding that this is an exceptional case is not
clearly erroneous, and its decision to award attorney=s fees is not an abuse of discretion.[102]








A trial court
may not, however, grant a party an unconditional award of appellate attorney=s fees, because to do so could penalize the other
party for pursuing a meritorious appeal.[103]  We therefore hold that the trial court erred
by failing to condition the award of appellate fees on a successful appeal.[104]
Accordingly, we modify the judgment to reflect that Brand FX is only eligible
to receive attorney=s
fees upon successful appeal, and we affirm the award of attorney=s fees as modified.[105]

VIII.    
CONCLUSION

We modify the trial court=s judgment to reflect that Brand FX is only
eligible to receive appellate attorney=s fees if successful on appeal, and we affirm the
judgment as modified.

 

 

BOB MCCOY

JUSTICE

PANEL: 
LIVINGSTON and MCCOY, JJ.

 

DELIVERED: April 8, 2010











[1]See Tex. R. App. P. 47.4.





[2]AUtility bodies@ are covered cabinets that mount on the back portion of a commercial
truck frame, and Awork toppers@ are covered cabinets placed on top of a pickup truck bed.  Brand FX=s utility
bodies are the subject of its false advertising claim, and the stair-step roof
design of its work topper is the subject of its trade dress infringement
claim.  Trade dress refers to the design
or packaging of a product that serves to identify the product=s manufacturer or source.  TrafFix
Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 28, 121 S. Ct. 1255,
1259 (2001).





[3]A plug is typically a wooden part that is supposed to look identical
to the finished product and used to build a mold.  The mold is then used to produce the finished
product to the dimensions of the plug. 





[4]15 U.S.C.A. ' 1125(a) (West 2009).  The
Lanham Act provides civil remedies for trade dress infringement and false
advertising of trademarks or trade dress. 
See id.  Section 1125(a)
specifically provides:

 

Any person who . . . 

 

(A) is likely to cause confusion, or to cause mistake, or to deceive
as to the affiliation, connection, or association of such person with another
person, or as to the origin, sponsorship, or approval of his or her goods,
services, or commercial activities by another person, or 

 

(B) in commercial advertising or promotion, misrepresents the nature,
characteristics, qualities, or geographic origin of his or her or another
person=s goods, services, or commercial activities, shall be liable in a
civil action by any person who believes that he or she is or is likely to be
damaged by such act.

 

Id.





[5]Astoria Indus. of Iowa, Inc. v. SNF, Inc., 223 S.W.3d 616, 639 (Tex. App.CFort Worth
2007, pet. denied) (op. on reh=g) (reversing,
on interlocutory appeal, trial court=s order
denying Astoria=s requested summary judgment and rendering take nothing judgment on
Brand FX=s business disparagement claim).





[6]See 15 U.S.C.A. ' 1125(a)(3)
(AIn a civil action for trade dress infringement under this chapter for
trade dress not registered on the principal register, the person who asserts
trade dress protection has the burden of proving that the matter sought to be
protected is not functional.@); Wal‑Mart
Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 210B11, 215, 120 S. Ct. 1342B43, 1346
(2000) (holding trade dress is included under Lanham Act=s trademark protections if it is inherently distinctive or
distinctiveness is acquired by developing secondary meaning, which denotes
that, Ain the minds of the public, the primary significance of a [mark] is to
identify the source of the product rather than the product itself@).





[7]Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh=g), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, "No
Evidence" and "Insufficient Evidence" Points of Error, 38
Tex. L. Rev. 361, 362B63 (1960).





[8]Cent. Ready Mix Concrete Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005).





[9]Cont=l Coffee Prods. Co. v. Cazarez, 937 S.W.2d
444, 450 (Tex. 1996); Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex.
1996).





[10]Kindred v. Con/Chem, Inc., 650 S.W.2d
61, 63 (Tex. 1983).





[11]Rocor Int=l, Inc. v. Nat=l Union Fire
Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).





[12]Pool v. Ford Motor Co., 715 S.W.2d
629, 635 (Tex. 1986) (op. on reh=g); Garza
v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965); In re King=s Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).





[13]See 15 U.S.C.A. ' 1125(a);
TrafFix, 532 U.S. at 28, 121 S. Ct. at 1257; Samara Bros., 529 U.S.
at 210B11, 215, 120 S. Ct. at 1342B43, 1346.





[14]See 15 U.S.C.A. ' 1125(a)(3)
(providing that burden is on person asserting protection to prove trade dress
is not functional when trade dress is unregistered); Two Pesos, Inc. v. Taco
Cabana, Inc., 505 U.S. 763, 766 n.4, 112 S. Ct. 2753, 2756 n.4 (1992)
(holding burden is on manufacturer to establish secondary meaning when trade
dress is not inherently distinctive).





[15]See Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 537 (5th Cir. 1998), abrogation on other grounds
recognized by Eppendorf‑Netheler‑Hinz GMBH v. Ritter GMBH, 289
F.3d 351, 356 (5th Cir.), cert. denied, 537 U.S. 1071 (2002).





[16]TrafFix, 532 U.S. at 32B33, 121 S. Ct. at 1261B62.  Without objection, the jury was instructed
that A[a] product feature is considered functional if it is essential to the
use or purpose of the product or if it affects the cost or quality of the
product.@ 





[17]Id.; see also Eppendorf‑Netheler‑Hinz
GMBH, 289 F.3d at 356.





[18]See, e.g., Epic Metals Corp. v. Souliere, 99 F.3d
1034, 1038 (11th Cir. 1996) (holding that a steel deck=s corrugated dovetail profile impacts the sectional modulus of the
deck, determining how much stress the product will tolerate and ultimately
affecting the product=s strength).





[19]Astoria points to a Brand FX advertisement stating that A[w]ith a BRAND FX topper, you=re assured of
outstanding strength and durability in a product weighing substantially less
than steel or aluminum.@  But that advertisement
promotes the advantages of Brand FX=s fiberglass
product over metal toppers, not any advantages of the stair-step design over
toppers with other roof shapes.





[20]See City of San Antonio v. Pollock, 284
S.W.3d 809, 818 (Tex. 2009) (holding that a scientific opinion is conclusory
and cannot be considered probative evidence Aif no basis
for the opinion is offered, or the basis offered provides no support@).





[21]See TrafFix, 532 U.S. at 32B33, 121 S. Ct. at 1261B62 (holding
that a product is generally functional if it is essential to the use or purpose
of the article or affects the cost or quality of the article).





[22]See Pool, 715 S.W.2d at 635; Garza, 395 S.W.2d at
823.





[23]15 U.S.C.A. ' 1125(a); Samara Bros., 529 U.S. at 210, 215, 120 S. Ct.
at 1343, 1346.





[24]Samara Bros., 529 U.S. at 211, 215, 120 S. Ct. at 1343, 1346;
see 15 U.S.C.A. ' 1125(a).  The jury was
instructed without objection that trade dress Aacquires >secondary meaning= if it is
uniquely associated with a specific source and identifies the source of the
product rather than the product itself.@ 





[25]Sunbeam Prods. Inc. v. W. Bend Co., 123
F.3d 246, 253 (5th Cir. 1997), cert. denied, 523 U.S. 1118 (1998), abrogation
on other grounds recognized by Eppendorf‑Netheler‑Hinz GMBH,
289 F.3d at 356.





[26]Pebble Beach Co., 155 F.3d at 541;
Sunbeam Prods, 123 F.3d at 254.





[27]Sunbeam Prods., 123 F.3d at 254.





[28]See id.





[29]See id. at 254B55.





[30]See Pebble Beach Co., 155 F.3d at
541; Sunbeam Prods., 123 F.3d at 254.





[31]See, e.g., Zatarain=s, Inc. v. Oak Grove Smokehouse, Inc., 698 F.2d 786, 791 (5th Cir. 1983) (holding that plaintiff
established secondary meaning through predecessor=s prior continued use of the mark and other factors), overruled on
other grounds by KP Permanent Make‑Up, Inc. v. Lasting Impression I, Inc.,
543 U.S. 111, 116, 124, 125 S. Ct. 542, 547, 551 (2004). 





[32]Vision Ctr. v. Opticks, Inc., 596 F.2d
111, 115 (5th Cir. 1979), cert. denied, 444 U.S. 1016 (1980).





[33]Japan Telecom, Inc. v. Japan Telecom Am. Inc., 287 F.3d 866, 875 (9th Cir. 2002).





[34]As circumstantial evidence of the relevant number of potential
purchasers of utility bodies and work toppers, the trade journal in which
Astoria ran its ADARE TO COMPARE@ advertising campaign had a monthly circulation of approximately
18,000. 





[35]See Pool, 715 S.W.2d at 635; Garza, 395 S.W.2d at
823.





[36]U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc., 865 S.W.2d 214, 218 (Tex. App.CWaco 1993,
writ denied).





[37]Id. at 217. 
Other unfair competition claims include theft of trade-secrets and Apalming off@ one=s product as that of another.  Id.





[38]Id. at 218.





[39]Wyeth v. Levine, 129 S. Ct. 1187, 1194B95 & 1195 n.3 (2009) (quoting Medtronic, Inc. v. Lohr, 518
U.S. 470, 485, 116 S. Ct. 2240, 2250 (1996)).





[40]Id. at 1193 (quoting Hines v. Davidowitz, 312
U.S. 52, 67, 61 S. Ct. 399, 404 (1941)); see BIC Pen Corp. v. Carter,
251 S.W.3d 500, 504 (Tex. 2008).





[41]See Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 152, 109 S. Ct. 971, 978 (1989).





[42]Id. at 152, 109 S. Ct. at 978.





[43]Id. at 156, 109 S. Ct. at 980 (emphasis added).





[44]Id. at 158, 109 S. Ct. at 981 (emphasis added).





[45]Id. at 164, 109 S. Ct. at 985 (holding in part that Athe law of unfair competition . . . [has] coexisted harmoniously with
federal patent protection for almost 200 years, and Congress has given no
indication that [its] operation is inconsistent with the operation of the
federal patent laws@).





[46]Id. at 156, 159, 109 S. Ct. at 980, 982 (emphasis
added) (holding Florida statute is preempted because it is Aaimed directly at preventing the exploitation of the design and utilitarian
conceptions embodied in the product itself@ and Aconstrict[s] the spectrum of useful public knowledge@ (emphasis added)).





[47]See 15 U.S.C.A. ' 1125(a);
Samara Bros., 529 U.S. at 210, 215, 120 S. Ct. at 1343, 1346.





[48]See Bonito Boats, 489 U.S. at 158, 109 S.
Ct. at 981.





[49]On appeal, Astoria does not challenge the jury=s finding that it is liable for false advertising or that Brand FX Ahas been or is likely to be injured@ as a result;
it only challenges lost profits awarded on the claim.





[50]Alternative to its JNOV motion, Brand FX requested that the trial
court disregard the jury=s zero lost profits finding.  As
the following dated and initialed docket entry states, the court granted JNOV
rather than the alternative relief Brand FX requested:  A1/24/08 B P motion JNOV is granted awarded $630,000 FWD [the Honorable Fred W.
Davis].@ 





[51]See Tex. R. Civ. P. 301; Tiller
v. McLure, 121 S.W.3d 709, 713 (Tex. 2003); Fort Bend County Drainage
Dist. v. Sbrusch, 818 S.W.2d 392, 394 (Tex. 1991).





[52]Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000); Farlow v. Harris Methodist Fort
Worth Hosp., 284 S.W.3d 903, 919 (Tex. App.CFort Worth 2009, pet. denied).  





[53]See Wal-Mart Stores, Inc. v. Miller, 102
S.W.3d 706, 709 (Tex. 2003).





[54]Cent. Ready Mix Concrete Co., 228 S.W.3d
at 651; see Tanner v. Nationwide Mut. Fire Ins. Co., 289 S.W.3d 828, 830
(Tex. 2009).





[55]Logan v. Burgers Ozark Country Cured Hams Inc., 263 F.3d 447, 462 (5th Cir. 2001).





[56]15 U.S.C.A. ' 1117(a) (West 2009) (emphasis added).





[57]See Am. Rice, Inc. v. Producers Rice Mill, Inc., 518 F.3d 321, 340 (5th Cir. 2008); Qaddura v. Indo‑European
Foods, Inc., 141 S.W.3d 882, 889 (Tex. App.CDallas 2004, no pet.). 





[58]Martin=s Herend Imports, Inc. v. Diamond & Gem Trading USA, Co., 112 F.3d 1296, 1304 (5th Cir. 1997).





[59]Pebble Beach Co., 155 F.3d at 554.





[60]Am. Rice, 518 F.3d at 338; Quick Techs., Inc. v. Sage
Group PLC, 313 F.3d 338, 349 (5th Cir. 2002), cert. denied, 540 U.S.
814 (2003).





[61]Quick Techs., 313 F.3d at 349.  Brand FX does not contend that this is a case
of palming off, but that there is evidence of each of the other factors
supporting an award of Astoria=s profits.





[62]Logan, 263 F.3d at 464B65.





[63]15 U.S.C.A. ' 1117(a).





[64]Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 207, 62 S. Ct. 1022, 1025 (1942); see also Qaddura,
141 S.W.3d at 889.





[65]Mishawaka, 316 U.S. at 206, 62 S. Ct. at 1024 (emphasis
added).





[66]See Logan, 263 F.3d at 464B65; Pebble Beach Co., 155 F.3d at 555.





[67]Qaddura, 141 S.W.3d at 889 (emphasis added).





[68]Astoria argues that this evidence cannot support diversion of sales
because it fails to establish that any particular sale was won by Astoria or
lost by Brand FX.  However, this evidence
is circumstantial evidence of sales diversion, particularly as Brand FX and
Astoria comprise approximately ninety percent of the fiberglass utility body
and work topper market.  Any ultimate
fact may be proved by circumstantial evidence.  Russell v. Russell, 865 S.W.2d 929, 933
(Tex. 1993).  A fact is established by
circumstantial evidence when the fact may be fairly and reasonably inferred
from other facts proved in the case.  Id.





[69]See Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582, 586 (5th Cir. 1980).





[70]See id.





[71]The jury was asked if they found Aby clear and
convincing evidence that the harm to Brand FX resulted from malice,@ and they were instructed that Amalice@ means Aa specific intent by Astoria to cause substantial injury or harm to
Brand FX.@  The jury answered ANo.@  This answer is not controlling
on the issue of willful misconduct because the court=s determination of whether an award of lost profits is appropriate on
a false advertising claim does not require Aclear and
convincing evidence,@ and it considers the defendant=s intent to
commit the violation, not its intent Ato cause
substantial injury or harm.@  See 15 U.S.C.A. ' 1117(a); Am. Rice, 518 F.3d at 338; Quick Techs.,
313 F.3d at 349.





[72]See Maltina Corp., 613 F.2d at 586.





[73]See Am. Rice, 518 F.3d at 338.





[74]See 15 U.S.C.A. ' 1117(a).





[75]See id.





[76]See id.





[77]See Wal-Mart Stores, Inc. v. Miller, 102
S.W.3d 706, 709 (Tex. 2003).





[78]See Prudential Ins. Co. of Am., 29 S.W.3d at
77; Farlow, 284 S.W.3d at 919. 
Brand FX urges us to review the trial court=s profits award for abuse of discretion.  See Pebble Beach Co., 155 F.3d at
554.  Because the trial court submitted
the issue to the jury and granted JNOV, we review its decision under the JNOV
standard.  See, e.g., Tex.
Pig Stands, Inc. v. Hard Rock Cafe Int=l, Inc., 951 F.2d 684, 697 (5th Cir. 1992) (reviewing
under JNOV standard trial court=s decision to
overturn recovery based on jury=s ' 1117(a) finding).  Astoria
presented no evidence of its costs or deductions as required by ' 1117(a) and, thus, we would reach the same result under either
the JNOV or the abuse of discretion standard. 
See id.





[79]Although Astoria challenges its admissibility, Astoria does not
contest the competence of Jackson=s opinion
testimony regarding Brand FX=s corrective
advertising damages as unreliable, irrelevant, or otherwise.  And although we acknowledge Astoria=s post submission letter brief enclosing a copy of the slip opinion in
City of San Antonio v. Pollock, 284 S.W.3d 809 (Tex. 2009), in which the
supreme court reaffirms that Abare baseless
opinions will not support a judgment even if there is no objection to their
admission in evidence,@ Astoria does not assert that Jackson=s opinion regarding corrective advertising costs is baseless or
conclusory.





[80]In re J.P.B., 180 S.W.3d 570, 575 (Tex. 2005); Nat=l Liab. & Fire Ins. Co. v. Allen, 15
S.W.3d 525, 527B28 (Tex. 2000) (op. on reh=g). 





[81]Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998).





[82]Low v. Henry, 221 S.W.3d 609, 614 (Tex. 2007); Cire
v. Cummings, 134 S.W.3d 835, 838B39 (Tex.
2004).





[83]E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995); see also Low, 221 S.W.3d at
620.





[84]Tex. R. App. P. 44.1(a); see Reliance Steel & Aluminum Co. v.
Sevcik, 267 S.W.3d 867, 871 (Tex. 2008); Romero v. KPH Consolidation,
Inc., 166 S.W.3d 212, 225 (Tex. 2005).





[85]Interstate Northborough P=ship v. State, 66 S.W.3d 213, 220 (Tex. 2001); City of Brownsville v. Alvarado,
897 S.W.2d 750, 753B54 (Tex. 1995).





[86]State v. Cent. Expressway Sign Assocs., 302 S.W.3d 866, 870 (Tex. 2009); Reliance Steel, 267 S.W.3d
at 873.





[87]Interstate Northborough P=ship, 66 S.W.3d at 220.





[88]Bay Area Healthcare Group, Ltd. v.
McShane, 239 S.W.3d 231, 234 (Tex. 2007); Sw. Elec. Power Co. v.
Burlington N. R.R., 966 S.W.2d 467, 473 (Tex. 1998).





[89] Bay Area Healthcare Group, 239 S.W.3d
at 235; Richardson v. Green, 677 S.W.2d 497, 501 (Tex. 1984).





[90]Interstate Northborough P=ship, 66 S.W.3d at 220; Gee v. Liberty Mut. Fire Ins. Co., 765
S.W.2d 394, 396 (Tex. 1989).





[91]Admission of otherwise inadmissible facts or data underlying an expert=s opinion is governed by Texas Rule of Evidence 705, which provides in
relevant part:

 

(a) Disclosure of Facts or Data.  The expert may testify in terms of opinion or
inference and give the expert=s reasons
therefor without prior disclosure of the underlying facts or data, unless the
court requires otherwise.  The expert
may in any event disclose on direct examination, or be required to disclose on
cross‑examination, the underlying facts or data.

. . . .

(d) Balancing test; limiting instructions.  When the underlying facts or data would be
inadmissible in evidence, the court shall exclude the underlying facts or data
if the danger that they will be used for a purpose other than as explanation or
support for the expert=s opinion outweighs their value as explanation or support or are
unfairly prejudicial.  If otherwise
inadmissible facts or data are disclosed before the jury, a limiting
instruction by the court shall be given upon request.

 

 Tex. R.
Evid. 705(a), (d) (emphasis added).  





[92]In its briefing before the court, Astoria states that A[n]o one can dispute that Tex[as] R[ule of] Evid[ence] 703 allows an
expert to rely on facts not otherwise admissible in evidence@ and that Aexperts are typically allowed to disclose otherwise inadmissible
hearsay for the limited purpose of explaining the basis of their opinions@ even though such hearsay is not admissible for its truth [citation omitted].@ 





[93]See Bay Area Healthcare Group, 239 S.W.3d
at 235; Interstate Northborough P=ship, 66 S.W.3d at 220; Gee, 765 S.W.2d at 396; Richardson,
677 S.W.2d at 501.





[94]See Tex. R. App. P. 44.1(a)(1); Interstate
Northborough P=ship, 66 S.W.3d at 220.





[95]15 U.S.C.A. ' 1117(a).





[96]Seven‑Up Co. v. Coca‑Cola Co., 86 F.3d 1379, 1390 (5th Cir. 1996) (citing CJC Holdings, Inc. v.
Wright & Lato, Inc., 979 F.2d 60, 65 (5th Cir. 1992)).





[97]Tex. Civ. Prac. & Rem. Code Ann. ' 41.001(2) (Vernon 2008); Transp. Ins. Co. v. Moriel, 879
S.W.2d 10, 31 (Tex. 1994).





[98]Seven-Up Co., 86 F.3d at 1390.





[99]CJC Holdings, 979 F.2d at 65.





[100]Seven-Up Co., 86 F.3d at 1390.





[101]Schlotzsky=s, Ltd. v.
Sterling Purchasing & Nat=l Distribution
Co., 520 F.3d 393, 402 (5th Cir. 2008).





[102]See, e.g. Schlotzsky=s, Ltd., 520 F.3d at 402 (affirming award of attorney=s fees based on defendant=s bad faith
misrepresentations in violation of Lanham Act); Taco Cabana Int=l, 932 F.2d at 1127B28 (affirming award of attorney=s fees based
on defendant=s Abrazen imitation@ of direct competitor=s trade
dress).





[103]Weynand v. Weynand, 990 S.W.2d 843, 847
(Tex. App.CDallas 1999, pet. denied).





[104]See J.C. Penney Life Ins. Co. v. Heinrich, 32 S.W.3d 280, 290 (Tex. App.CSan Antonio
2000, pet. denied).





[105]See Tex. R. App. P. 43.2(b) (providing appellate
court may modify judgment and affirm as modified); see also Tully v.
Citibank (South Dakota), N.A., 173 S.W.3d 212, 219 (Tex. App.CTexarkana 2005, no pet.) (modifying judgment to condition attorney=s fees on successful appeal); Heinrich, 32 S.W.3d at 290
(same).